[No. A117286. First Dist., Div. Five. Jan. 9, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
JERRY LARIOSA CABONCE, Defendant and Appellant.

## COUNSEL

Michael J. Hersek, State Public Defender, and Craig Buckser, Deputy State Public Defender, under appointments by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**NEEDHAM, J.**—Jerry Lariosa Cabonce (Cabonce) appeals from a judgment of conviction and sentence imposed after a jury found him guilty of multiple offenses and rejected his defense of insanity. Challenging only the sanity finding, Cabonce contends the court's response to an inquiry by the jury during deliberations improperly suggested that his insanity defense could be rejected if Cabonce's insanity was caused in part by his intoxication at the time of the offense. We will affirm the judgment.

### I. *FACTS AND PROCEDURAL HISTORY*

Cabonce was charged with two counts of deliberate and premeditated attempted murder of peace officers (Pen. Code, §§ 187, subd. (a), 664); two counts of assault with a deadly weapon (knife) by means of force likely to produce great bodily injury on peace officers (§ 245, subd. (c)); and two counts of assault with a deadly weapon (pellet gun) (§ 245, subd. (a)(1)).[1]

As to counts 1 through 4, Cabonce was alleged to have personally inflicted great bodily injury (§ 12022.7 subd. (a)). As to counts 1 and 2, it was alleged that he personally used a deadly weapon (§ 12022, subd. (b)). The amended information further alleged that Cabonce had a prior serious felony conviction for aggravated assault (§ 667, subd. (a)), which constituted a strike under section 1170.12, subdivision (c)(1).

In early 2004, Cabonce was found incompetent to stand trial pursuant to sections 1367 and 1368. In November 2004, the court determined after a hearing that Cabonce's competence had been restored, and criminal proceedings were reinstated.

---

[1] All statutory references are to the Penal Code.

Cabonce entered a plea of not guilty by reason of insanity in January 2005. Criminal proceedings were suspended pursuant to sections 1026 and 1027, and doctors were appointed to examine Cabonce's competency. Cabonce was found incompetent to stand trial in August and September 2005.

In August 2006, Cabonce was again found competent to stand trial. The defense subsequently expressed renewed doubt about Cabonce's competency. After a hearing in November 2006, the court found there was no substantial change of circumstances and Cabonce remained competent to stand trial.

Defense counsel on two more occasions declared doubts regarding Cabonce's competency. The court ruled both times that there was neither a substantial change in circumstances nor new evidence of incompetency.

Cabonce entered a plea of not guilty and not guilty by reason of insanity to the amended information and denied the special allegations.

A. *Guilt Phase*

Jury trial began on January 10, 2007. As to counts 5 and 6, the People asserted that Cabonce committed assault with a deadly weapon on Lisa and Jet Sze. As to counts 1 through 4, the People asserted that Cabonce committed assault with a deadly weapon and attempted murder on police officers investigating the incident.

1. *Counts 5 and 6 (Assault with Pellet Gun on Lisa and Jet Sze)*

Around 8:30 a.m. on August 11, 2003, Lisa Sze was walking her three-year-old son, Jet Sze, to his first day of preschool.[2] Lisa heard a couple of popping sounds, heard Jet crying, and felt something strike her calf. She turned and saw a cab with ethnic flags on the dashboard and a flag painted on the trunk. The passenger door of the cab was open, and a man lying across the seats was shooting at her and Jet. Lisa looked directly at the shooter and smelled what she later identified to be Jack Daniels Wild Berry whisky coming from the cab. She saw blood on her son and screamed for help. The cab "tore off," and Lisa went to a nearby building and asked the doorman to call the police. Jet had been shot three times by what turned out to be a pellet gun. At trial, Lisa identified Cabonce as the shooter.

Gene McDonald was a passenger in a different cab on August 11. He observed a cab, bearing a flag on the trunk and checkered decals, pull over

---

[2] Because they have the same last name, we refer to Lisa and Jet by their first names for clarity, without disrespect.

and then abruptly pull back out. A woman with a child was screaming and upset, and McDonald called 911 on his cell phone. McDonald's cab driver, William Creighton, also noticed the other cab pull over abruptly and heard screaming from the sidewalk.

San Francisco Police Officer John Ferrando responded to the scene. Lisa told him she was walking by a cab, which had a door open, and the driver pointed a gun and shot at her and Jet. Doorman George Cheisivili handed Officer Ferrando two BB gun pellets that he had found on the ground, and the officer found a third pellet. Sergeant Timothy Reid, the range master for the San Mateo County Sheriff's Office, explained that the pellet gun used by Cabonce constituted a dangerous and deadly weapon.

### 2. Counts 1–4 (Offenses Against Police Officers)

On August 11, 2003, San Francisco Police Inspector Leanora Militello and her partner Patricia Correa were investigating the reported assault by a cab driver with a pellet gun on a woman and child. They learned the license plate of the cab and that it had been found in front of 379 Woodrow Street in Daly City. The officers proceeded to the address in an unmarked Crown Victoria.

Officers Correa and Militello observed a cab in front of 379 Woodrow Street, matching the description and license plate of the cab involved in the shooting. They did not see anyone in the cab and decided to tow it. As they pulled up alongside, they noticed a man standing at the rear of the cab. Although they had a photograph of Cabonce, the man was disheveled and did not look like the man in the photograph. The officers nonetheless decided to talk to him. Neither officer was in uniform or had her gun drawn.

Officer Correa pulled out her badge, approached the man, identified herself as a San Francisco police officer, put her hand on his shoulder, and asked if she could talk to him. At trial, Officer Correa identified this man as Cabonce.

Cabonce looked at Officer Correa, looked at the badge, and pulled away slightly. As Cabonce became agitated, Correa told him they only wanted to talk, and Officer Militello placed her hand on his shoulder to calm him. Cabonce grinned. Then he stabbed Correa in her left side about three inches above the waist, stabbed Militello in the breast area, turned back to Correa and stabbed her in the chest area, and started for Militello again. Both officers, severely injured, retreated to their vehicle.

Officer Militello next saw Cabonce in the window of 379 Woodrow Street, pointing what appeared to be a gun in their direction. Unable to get through on her police radio, Militello shouted for someone to call 911. A citizen came

to the officers' aid and helped Correa get her weapon; when Cabonce came down the stairs of the house and raised his gun, she fired two shots. The Daly City police arrived at the scene. The officers were transported to the hospital and, subsequently, identified Cabonce in a photographic lineup as the person who stabbed them.

Cabonce's neighbor, Benedicto Navarro, testified that he saw Cabonce on August 11 cleaning his taxi. When a police car approached, Cabonce crouched down and went around the cab, opened the trunk, and took out a knife. Two women approached Cabonce and said they were San Francisco police officers.[3] Cabonce stabbed both officers. Navarro got a tool bar and approached Cabonce, who ran into his house. Cabonce later appeared in the window, pointing what appeared to be a gun. Navarro told the officers that Cabonce had a gun and helped one officer reach a safer position.

Carlos Montes was also on Woodrow Street on August 11. He saw a parked car, which, although it was unmarked, he realized was a police vehicle. The officers approached a cab, and a man appeared. The officers identified themselves as San Francisco police officers, and one officer displayed her badge. The man, whom Montes identified at trial as Cabonce, took an 18-inch knife from his trunk and stabbed one of the officers. He turned and lunged at the other officer, stabbing her, and then stabbed the first officer again. Montes ran after Cabonce, who ran into the house. When Montes saw Cabonce in the window with what looked like a gun, he ducked behind a car.

After Cabonce refused Daly City police orders to come out of his residence, a police SWAT team responded to the scene. Cabonce was observed drinking in the residence. The SWAT team members went through the backyard and saw Cabonce through a sliding glass door, apparently passed out, with what seemed to be a gun on his body and a knife nearby. The officers forced their way into the residence and arrested him.

Cabonce was taken to jail. In his shirt, police found two unspent $CO_2$ cartridges and six pellets, which matched a pellet gun found at the scene. Two blood samples were drawn from Cabonce, an analysis of which revealed a 0.11 percent blood-alcohol concentration.

In a search of Cabonce's residence, police found a nearly empty bottle of Jack Daniels Wild Berry whisky in the living room, a knife and pellet gun in

---

[3] Navarro also told police that he heard one of the officers tell Cabonce they were going to tow his taxi because of a BB gun shooting. When recalled as a witness by the defense, however, Navarro testified that the officers shouted to Cabonce they wanted to talk to him, but Navarro did not hear them identify themselves as police officers or see either of them show a badge.

the entertainment room, and a tequila bottle containing tequila. In a search of Cabonce's cab, they found a tequila bottle containing what appeared to be Jack Daniels Wild Berry whisky, a box of pellets and CO2 cartridges on the front seat, and toy police badges, guns, and a plastic sword in the passenger area.

Daly City Police Detective Gregg Oglesby conducted videotaped interviews of Cabonce on August 11 and 12, beginning around 6:00 p.m. on August 11. Cabonce appeared to be under the influence of alcohol. Cabonce claimed he had been drunk and was protecting himself, although he did not know from whom. As to the pellet gun incident, Cabonce stated, "Well, I want my SSI all right." He claimed he was mad at people because the government had taken away his money. Cabonce did not think what he did was wrong, stating it is "okay to protect yourself." When asked why he felt threatened by the officers, Cabonce stated, "They were a threat to me that's all."

During Cabonce's interview on August 12, forensic psychiatrist James Missett was present. When Cabonce was asked if he knew right from wrong, he replied, "Of course I do!" Cabonce admitted that shooting someone with a BB gun was wrong and acknowledged that if you stab someone, he or she could be killed.

Cabonce stated he had been seeing a psychiatrist, had been hospitalized for psychiatric problems in the past, and had been on medication, which he stopped taking. He denied he was an alcoholic but acknowledged "sometimes I can drink a whole bottle."

When Cabonce was asked why he shot the woman and her little boy, Cabonce stated that he "promised to [himself] if they cut off [his] SSI, that's what I . . . ." Earlier Cabonce told the officers that he had told his mother that "if they cut of[f] my . . . my SSI, I would kill somebody."

Cabonce admitted it would be wrong to stab two officers for no reason, but not if they were invading his privacy. When asked if the officers were invading his privacy even though they were on the street rather than in his home, Cabonce replied, "A little bit, a little bit." Cabonce denied he knew the women were police officers, although he acknowledged they showed him a badge. He claimed he was drunk, but he knew that he stabbed them in the chest. Cabonce said that after he stabbed the women, he did not tell his family what happened, but he told them that some inmates were trying to get him.

When asked whom he felt close to in his life, Cabonce responded it was Chelsea Clinton, although he had never met her.

### 3. Defense Case

Cabonce's mother, Amelia Cabonce, testified that Cabonce first displayed mental health issues in 1984 and was taken to the psychiatric ward at San Francisco General Hospital. After that, he saw a psychiatrist but sometimes missed his appointments and stopped taking his medication. At some point he began receiving SSI (Supplemental Security Income) benefits from the Social Security Administration. Three weeks before August 11, 2003, however, his SSI benefits were cut off because he was earning money driving his taxicab. Upset and angry about the cessation of benefits, Cabonce told his mother, "I will kill them." He began dressing strangely, staring blankly, and laughing and talking when no one was there. On August 11, he left home around 6:00 a.m., and his mother next saw him around 9:00 a.m. In the afternoon, she heard a commotion and found Cabonce in the living room by the door, holding a knife and pellet gun. He appeared calm and claimed there were two inmates outside trying to hurt him.

Cabonce testified that he did not have any mental health problems, but admitted he was in a psychiatric ward in 1984 and again after he stabbed his brother-in-law while trying to protect himself. He was treated for schizophrenia and received medication, but stopped taking it.

In August 2003, Cabonce was upset when he lost his Social Security benefits. He filed a lawsuit against the county in 2003, believing the United States owed him several million dollars. He wrote to Chelsea Clinton to help him with the lawsuit.

On August 11, 2003, Cabonce left his house early in the morning for San Francisco, to go to Fisherman's Wharf for fun and Pier 39 to make money. He took his pellet gun. With the gun, he shot a young lady and her child so he could be captured and go to court to explain himself and assist his lawsuit. Although he had consumed alcohol before going to San Francisco, he denied being drunk when he shot the pellet gun.

Cabonce then went home and drank tequila. He saw the women (officers) at his house, thought they looked more "like big guys" and were gang members, and he became frightened. He did not hear them say they were police officers and did not see a badge. They attacked him, and he merely tried to block their arms. He denied stabbing them; instead, he was "holding a knife that was bleeding." He then got his BB gun to scare them. He did not remember what happened with the officers because he was drunk.

Pablo Stewart, an expert in forensic psychiatry, performed a psychiatric evaluation of Cabonce in August 2003 at the request of defense counsel.

According to records Stewart reviewed, Cabonce had been diagnosed with paranoid schizophrenia, psychotic disorder not otherwise specified, a serious mental illness relating to paranoid schizophrenia, an adjustment disorder and depressed mood, and atypical psychosis. In Stewart's opinion, Cabonce suffered from a chronic psychotic condition in the schizophrenic range and schizoaffective disorder with superimposed mood disorders such as depression and mania. His secondary diagnoses were substance abuse related disorders.

Cabonce told Dr. Stewart that he shot the woman and child to bring attention to his plight and elicit the help of Chelsea Clinton. Cabonce also admitted that he saw the officer's badge but thought it was fake. Dr. Stewart was aware, however, that Cabonce admitted to Dr. Firestone (see *post*) that he knew the women were police officers, saw their badges, and cut them for the same reason he shot the woman and child—he was angry and wanted recompense from the government.

Dr. Jeffrey Weiner, a forensic psychiatry expert, opined that Cabonce suffered from schizoaffective disorder. In videotapes of Cabonce's interviews with the police, Cabonce appeared both psychotic and intoxicated. Cabonce told Dr. Weiner that, by shooting the woman and child, the injustice he perceived in his life would be called to public attention and he would be compensated $50 million to $500 million in a lawsuit he intended to file. As to the stabbing of the officers, Cabonce admitted he saw the police officer's badge but believed it was fake. In Dr. Weiner's opinion, Cabonce was psychotic at the time of the stabbings based on his prior mental health issues, reports he was off his medication, and a statement by one of the officers that Cabonce had an "eerie grin."

Dr. Nell Riley, an expert in neuropsychology, administered about 15 neuropsychological tests in October 2006 and concluded Cabonce had neuropsychological impairments in mental processing, attention, verbal learning, and reasoning. He showed deficits in regions demonstrated to be commonly affected in patients with schizophrenia. Dr. Riley stated that schizophrenia and related mental illnesses are considered serious mental disorders.

### 4. *People's Rebuttal*

Jonathan French, an expert in forensic psychology, examined Cabonce and reviewed materials relating to the case, including psychiatric evaluations and Cabonce's taped statements to police. Dr. French believed the most accurate diagnosis was atypical psychosis, not otherwise specified, with a secondary diagnosis of a personality disorder called schizotypical personality disorder. He noted, however, that having a mental disorder does not automatically

preclude the possibility of premeditation. Cabonce, even when unmedicated, was not always psychotic, and his symptoms would come and go. In the initial interview with police, Cabonce appeared very drunk but *not* psychotic.

Forensic psychiatrist James Missett believed it was a "toss up" whether Cabonce suffered from a major mental illness at the time of the stabbings. Cabonce's prior records indicated he suffered from a major mental illness but also showed he was a major manipulator, passive aggressive, and someone who would say or do anything to get what he wants. In Dr. Missett's opinion, Cabonce probably would qualify for a diagnosis of psychotic disorder not otherwise specified that was intermittent in nature (sometimes present and sometimes not), personality disorder, and antisocial conduct.

Dr. Missett attended Cabonce's police interview on August 12, 2003, and he did not observe any objective signs in Cabonce's responses to the officers to indicate he was suffering from a major mental illness. He may have "wandered off" at times when speaking, but that could have been due to his drinking on August 11. Dr. Missett believed that on August 11, Cabonce was able to think in a goal-directed, understandable and otherwise mentally competent manner.

### 5. *Verdict and Findings in Guilt Phase*

On January 25, 2007, the jury found Cabonce guilty as charged and found the enhancement allegations true.

At a bench trial, the court found that Cabonce's prior assault with a deadly weapon conviction had been proven, pursuant to section 667, subdivision (a) and section 1170.12.

### B. *Sanity Phase*

At the ensuing sanity trial, the defense did not claim that Cabonce was legally insane when he fired the pellet gun at Lisa and Jet. The defense did assert, however, that as a result of his psychosis, Cabonce did not know that stabbing the police officers was wrong, because he believed the officers were assailants from whom he had to protect himself from an imminent attack. The prosecutor countered that Cabonce knew his actions were wrong or, alternatively, it was Cabonce's intoxication, not his mental illness, that caused him not to appreciate the wrongfulness of his actions.

### 1. *Cabonce's Evidence*

David Berke, a forensic psychologist with the parole board outpatient clinic, had been appointed by the trial court to evaluate Cabonce's competency to stand trial and had interviewed him three times. In his opinion, Cabonce was a paranoid schizophrenic, a condition that waxes and wanes.

Dr. Berke opined that Cabonce was insane when he stabbed the officers. Dr. Berke was not convinced Cabonce knew they were police officers, and Cabonce was so paranoid that he felt he was being attacked and morally justified in his actions. He was relieved when he saw the police helicopter because he thought he would get his deserved publicity.[4] In Berke's opinion, Cabonce did not have the ability to appreciate the wrongfulness and immorality of his act.

In his October 2006 report on competency, however, Berke opined that Cabonce's mental illness, *combined* with his substance abuse, impaired his ability to conform his behavior to the requirements of the law. At that time, Cabonce told Berke he did not mean to stab anyone, and he did not say he acted in self-defense. In addition, Berke admitted that if Cabonce knew that the women were police officers, it would change his opinion that Cabonce was insane when he stabbed them.

Forensic psychologist Ashley Cohen testified that, although Cabonce's past diagnoses varied, they all involved a psychotic disorder and constituted a serious mental illness. In Cohen's opinion, Cabonce was schizophrenic, possibly with some antisocial personality tendencies. She also believed he had substance abuse disorder, including abuse of alcohol and street drugs.

Cohen opined it was more likely than not that Cabonce was legally insane when he stabbed the officers. She believed Cabonce was capable of understanding right from wrong, but because of his delusions he believed at the time that he was in imminent danger. It was not clear if Cabonce was intoxicated before the stabbings, and she could not eliminate alcohol as playing a part in Cabonce's stabbing the officers.

### 2. *Prosecution Case*

Dr. Missett opined that Cabonce was not legally insane when he stabbed the officers. In Missett's view, it was unlikely Cabonce would not be psychotic earlier in the day but would become psychotic only when the officers

---

[4] Berke also noted that after the stabbing, Cabonce went into his house, told his mother there were inmates outside, and did not try to escape. Berke was unaware that two men intervened in the attack and chased Cabonce into his house.

arrived. In Cabonce's interview with police after the incident, there was no indication he was psychotic. His actions were inconsistent with someone who was paranoid, since he had his back to his alleged attackers, turned towards them only when they got close, crouched around the car, and got the knife. These actions suggested he was lying in wait to surprise his victims. Cabonce also admitted he saw the police badge.

In Dr. Missett's opinion, Cabonce was acting out of anger or vengeance, which is more indicative of a personality disorder than of mental illness, and demonstrated his sanity. Cabonce knew what he was doing was wrong but he chose to do it anyway.

Dr. Missett, certified in addiction psychiatry, further opined that Cabonce appeared to have had an alcohol abuse problem at the time of the stabbing, although the exact time frame of his drinking that day was unclear. Cabonce's drinking could have prevented him from forming accurate memories at the time or distorted some of his memory after the fact. Furthermore, if Cabonce had been drinking that morning, some of his behavior at the time of the stabbing could be attributed to his alcohol and substance abuse.

Dr. Marvin Firestone, an expert in forensic psychiatry, was appointed by the court to render an opinion on whether Cabonce was sane at the time of the stabbings. He concluded Cabonce was sane at that time, even though he suffered from a chronic psychotic disorder. According to reports, witness statements, and Cabonce's admissions, Cabonce had been drinking and not taking his antipsychotic medication. Alcohol consumption reduces inhibitions and exaggerates the underlying personality, and Cabonce had a long history of antisocial personality traits. In the video of Cabonce's interview with police on August 11, there was no evidence of psychotic thinking and Cabonce expressed reasons why he did what he did. Dr. Firestone believed Cabonce was drunk, not psychotic. In Dr. Firestone's opinion, Cabonce knew what he was doing when he stabbed the officers and knew it was wrong.

### 3. *Jury Instructions and Finding*

As we will discuss at length *post*, the court instructed the jury on the insanity defense pursuant to CALJIC Nos. 4.00 and 4.02, which advise among other things that the defense does not apply if the defendant's mental disease was caused entirely by addiction to or abuse of intoxicating substances. During deliberations, the jury asked the court a number of questions pertaining to these instructions. After the court's response to the jury's final inquiry, the jury found Cabonce sane. It is the court's response to the jury's final inquiry that is the subject of this appeal.

## C. *Sentence*

The trial court sentenced Cabonce to an aggregate term of 79 years to life imprisonment.

This appeal followed.

## II. *DISCUSSION*

Cabonce contends the trial court's answer to one of the jury's inquiries gave the jury the wrong standard to evaluate his insanity defense. In particular, he urges: (1) the court erroneously instructed the jury in regard to the limitation on the insanity defense imposed by section 25.5; (2) if section 25.5 does not apply to this case, the court made a number of other instructional errors; and (3) as a result of these errors, his rights to due process and a jury trial were violated.

### A. *The Court's Instructions Regarding the Insanity Defense and Section 25.5*

We consider in turn the court's initial instructions regarding the insanity defense, the jury's inquiries and the court's responses, and Cabonce's claim of error.

#### 1. *The Insanity Defense and the Court's Initial Instructions*

The court instructed the jury, in accordance with CALJIC No. 4.00, that insanity for purposes of the insanity defense is as follows: "A person is legally insane when *by reason of mental disease or mental defect* he was incapable at the time of the commission of the crime of one of the following: [one,] knowing the nature and quality of his act; or, [two,] understanding the nature and quality of his act; or, [three,] distinguishing what is legally right from what is legally wrong; or, [four,] distinguishing what is morally right from what is morally wrong." (Italics added.) Under CALJIC No. 4.00, if the defendant was unable to tell right from wrong due to something other than a mental disease or defect—such as voluntary intoxication—he cannot establish an insanity defense.

■ Section 25.5 provides the following limitation: "In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, this defense shall *not* be found by the trier of fact *solely on the basis of* a personality or adjustment disorder, a seizure disorder, or *an addiction to, or abuse of, intoxicating substances*." (Italics added.) This limitation has been interpreted to establish "an absolute bar prohibiting use of one's voluntary

ingestion of intoxicants as the *sole* basis for an insanity defense, regardless whether the substances caused organic damage or a settled mental defect or disorder which persists after the immediate effects of the intoxicant have worn off." (*People v. Robinson* (1999) 72 Cal.App.4th 421, 427 [84 Cal.Rptr.2d 832], italics added.) Thus, there can be no insanity defense when the inability to tell right from wrong derived (1) solely from an addiction or abuse of intoxicating substances, *or* (2) from a mental defect or disorder that itself was caused solely by such addiction or abuse.[5]

CALJIC No. 4.00 informed the jury of the limitation set forth in section 25.5. In part, it provided that legal insanity arises only if a mental defect or disease caused the inability to tell right from wrong. Moreover, the last paragraph of the instruction emphasized that the mental disease or defect cannot be based solely on addiction or abuse of intoxicating substances: "However, this defense of legal insanity does not apply when the *sole* or *only basis or causative factor* for the mental disease or mental defect is a personality disorder, a seizure disorder, or an addiction to, or *abuse of, intoxicating substances*." (CALJIC No. 4.00, italics added.)

CALJIC No. 4.02, with which the jury was instructed as well, also incorporates section 25.5 and emphasizes that the mental disease or defect cannot be caused solely by addiction or abuse: "A person is legally insane if by reason of mental disease or mental defect, either temporary or permanent, caused *in part* by the long continued use of alcohol, drugs, [or] narcotics even after the effects of recent use of alcohol, drugs, or narcotics have worn off, he was incapable at the time of the commission of the crime of either, [¶] [one,] knowing the nature and quality of his act; or, [¶] [two,] understanding the nature and quality of his act; or, [¶] [three,] distinguishing right from wrong. [¶] However, this defense does not apply when the *sole or only basis or causative factor* for the mental disease or mental defect *is an addiction to, or an abuse of, intoxicating substances*. [¶] The defendant has the burden of proving legal insanity at the time of the commission of the crimes by a preponderance of the evidence." (Italics added.)

Cabonce did not object to these instructions at trial.

---

[5] From the language of section 25.5 it is clear that the insanity defense does not apply where addiction or abuse of alcohol was the sole cause of the defendant's inability to tell right from wrong when he committed the offense. It may be less clear from the statutory language whether the insanity defense is also precluded where addiction or abuse of alcohol was the sole cause of the mental disorder or defect that rendered the defendant unable to tell right from wrong. CALJIC Nos. 4.00 and 4.02 expressly confirm that the defense is unavailable in this latter instance, as does the legislative history of section 25.5. (*People v. Robinson, supra,* 72 Cal.App.4th at pp. 427–428.)

## 2. *The Jury's Questions and the Court's Responses*

During its deliberations, the jury sent a note to the court, stating: "We need further explanation of the final paragraph on page 1 of jury instructions CALJIC 4.00 'The Defense of Insanity.' " In response, with counsel's approval, the court sent the following note to the jury: "What part of the last paragraph of CALJIC 4.00 do you not understand?"

The jury dispatched the following note: "We are struggling with the definition of legal insanity and the implication of intoxicating substances as it applies in this case. We have a problem with understanding what the phrase 'causative factor' means, again, as it applies to the facts of this case. We have two different interpretations of what this means."

Over defense counsel's unexplained objection, the court provided the following response based on an excerpt from CALCRIM No. 3450: "The answer to your question is as follows: [¶] Special rules apply to an insanity defense involving drugs or alcohol. Addiction to or abuse of drugs or intoxicants, by itself, does not qualify as legal insanity. This is true even if the intoxicants cause organic brain damage or a settled mental disease or defect that lasts after the immediate effects of the intoxicants have worn off. Likewise, a temporary mental condition caused by the recent use of drugs or intoxicants is not legal insanity."

The court received another note from the jury at 10:23 the next morning. It stated: "While we have decided on Counts 5 and 6, we are unable to reach consensus on counts 1–4. We are sitting at 11–1 sane and the one juror is not able to resolve his reasoning on forming his conclusion. The juror believes his mental condition was more causative than the alcohol. We are currently unable to reach consensus." While counsel and the court conferred on this note, they received another note, written by the jury at 11:25 a.m., which inquired: "Is 'causative factor' synon[y]mous with 'contributing factor' or does it mean main or primary factor."

The court interpreted the note to inquire further about the last part of CALJIC No. 4.00, which contains the phrase "causative factor." The prosecutor suggested that "causative factor" should be defined, essentially, as a primary factor. Defense counsel argued it should mean the sole factor. The court essentially agreed with defense counsel and sent a note to the jury stating: "As used in the last paragraph of CALJIC 4.00, the terms 'sole and only' modify both the terms 'basis' and 'causative factor.' " The jury was thus advised that the insanity defense could not be found where the only basis for, or only cause of, the mental disease or defect was an addiction or abuse of intoxicating substances.

At 1:35 p.m., the jury sent the following note: "The juror that maintains a [judgment] of insanity has stated that if causative factor means 'contributing to,' as opposed to sole and/or only factor, this would change the opinion and, thus, the verdict. The only hold up at this point involves the differences of opinion in the understanding of this instruction. [¶] Would it be read as sole causative factor or primary causative factor?"

After conferring with counsel, the court sent the following response: "The answer to your question is as follows: [¶] 1. The defense of legal insanity <u>never</u> can be proved, as a matter of law, when the mental disease or defect is caused <u>only</u> by an addiction to, or an abuse of, intoxicating substances. [¶] 2. *In some cases the defense of legal insanity might not be proved, based on the weight of the evidence and the facts as the jury finds them, when the mental disease or mental defect, is caused primarily by an addiction to, or an abuse of, intoxicating substances.*" (Italics added.) Defense counsel objected to the second paragraph of the court's response on the ground it was not a correct statement of law, without elaboration. It is this paragraph which Cabonce now contends was erroneous.

### 3. *Analysis*

Cabonce acknowledges that the first paragraph of the court's response to the jury's final inquiry was accurate (i.e., the insanity defense *cannot* be proved if the defendant's mental disease or defect was caused *entirely* by drug or alcohol addiction or abuse), but challenges the next paragraph of the court's response, which stated: "In some cases the defense of legal insanity *might not* be proved, based on the weight of the evidence and the facts as the jury finds them, when the mental disease or mental defect is caused *primarily* by an addiction to, or an abuse of, intoxicating substances." (Italics added.) Cabonce argues that the court impermissibly allowed the jury to reject the insanity defense if it found his intoxication at the time of the stabbing was merely the primary cause of his mental disease or defect.

██ The court stated the law correctly. Where the mental disease or defect is caused *in part* by an addiction or abuse of alcohol, legal insanity may or may not be established (CALJIC No. 4.02), depending on whether the defendant proves that it was his mental disease or defect that caused him to be unable to tell right from wrong. Thus, while the first paragraph of the court's response informed jurors that if intoxication was the sole cause of the defendant's mental disease or defect, the insanity defense did not apply *as a matter of law*, the contested second paragraph told jurors that if intoxication was merely a "primary" cause of the defendant's mental disease or defect, whether the insanity defense applied was a question of *fact* for the jurors to resolve based on the evidence, in light of the instructions.

The court's response was consistent with CALJIC No. 4.02, which reads in part: "A person is legally insane *if* by reason of mental disease or mental defect . . . caused *in part* by the long continued use of alcohol, . . . even after the effects of recent use of alcohol . . . have worn off, he was incapable at the time of the commission of the crime of . . . [¶] . . . [¶] . . . [d]istinguishing right from wrong," but the "defense does not apply when the *sole* or only basis . . . for the mental disease or mental defect is an addiction to, or an abuse of, intoxicating substances." Both the court's response to the jury's final question and CALJIC No. 4.02 explained that, where addiction or abuse of intoxicating substances was only a partial cause of the mental disease or defect, the insanity defense would apply if, at the time of the offense, the effects of any recent use of alcohol had worn off and the defendant was still incapable of distinguishing right from wrong.

Cabonce argues that the court should have told the jury "the defense of legal insanity *might* be proved" if addiction to or abuse of intoxicating substances was a primary cause of a defendant's mental disease or defect, rather than instructing them that "the defense of legal insanity might *not* be proved" in those circumstances. Cabonce's proposed language is just the flip side of the same coin. The reasonable inference from both the court's statement and Cabonce's version is that the insanity defense may or may not be proven when the defendant's substance abuse or addiction was a partial cause of his mental disease or defect, depending on whether he established that his mental disease or defect made him unable to discern right from wrong.

Cabonce also argues it would have been clearer if the trial court had *expressly* stated that abuse or addiction, if merely a partial cause of the mental disease or defect, could not preclude a finding of insanity if the elements of the defense were otherwise met. In other words, he insists the court should have instructed that, if intoxication was not the sole cause of his mental disease or defect, the insanity defense could not be rejected merely because there was evidence he was intoxicated. Because the jury rejected the defense just 20 minutes after the court's response to the final inquiry, he urges us to infer that the court's response led the holdout juror to believe the jury had discretion to reject the defense based on Cabonce's use of an intoxicating substance, even though it was not the sole cause of Cabonce's mental disease or defect.

■ Cabonce's argument is unpersuasive. First, because the court stated the law correctly, there is no reason to speculate on its effect on the jury. The court's statement responded to the jury's inquiry, and defense counsel did not propose any different response, explain any deficiency in the court's response, or suggest that the court needed to provide any further explanation. Nor did

the jury give the court any reason to suspect that it misunderstood the court's response or would apply it in a way contrary to law.

Second, even if we were to consider what the jury did after the court's response, we disagree with Cabonce's conclusion that the jury (or even the holdout juror) rejected the insanity defense because of evidence that intoxication partially caused his mental disease. The parties *did not contend*, and there was no evidence at trial, that it was Cabonce's *mental disease or defect* that was caused—solely, primarily, or to any extent—by his intoxication. To the contrary, after the defense argued that Cabonce did not know he was morally or legally wrong due to a major mental illness, the prosecutor countered that, if Cabonce could not tell right from wrong, it was not due to a mental illness, but *instead* due to a personality disorder exacerbated by his alcohol consumption.[6] The prosecutor's argument, therefore, was that Cabonce's intoxication contributed to his decision to commit the offense, not that his intoxication contributed to his mental disease or defect. Indeed, one of the jury's earlier notes indicated that the holdout juror believed Cabonce's "mental condition was more causative than the alcohol," ostensibly reflecting the juror's view at the time that Cabonce's mental disease or defect contributed more than his intoxication to the *commission of his crime* or to his *inability to tell right from wrong*. While the holdout juror apparently later focused on the section 25.5 language in CALJIC No. 4.00 and 4.02 (to which the defense never objected) pertaining to the cause of Cabonce's mental disease, it is logical to assume the jury ultimately returned to the rest of CALJIC No. 4.00 and unanimously agreed with the prosecutor that Cabonce either failed to prove he was unable to distinguish right from wrong or failed to prove it was the mental disease or defect (as opposed to his drinking that day) that had caused his inability to distinguish right from wrong.

Cabonce's reliance on cases from other jurisdictions is misplaced. Besides the fact that those decisions are not binding on us, the federal cases he cites do not support his position. In *U.S. v. Garcia* (2d Cir. 1996) 94 F.3d 57, 60, the trial court had rejected defendant's proposed instruction, which read in part: "if you find that the substance abuse either caused or was caused by a

---

[6] The parties do not contend there was evidence that Cabonce's mental illness was caused by addiction to or abuse of intoxicating substances. In fact, the prosecutor and defense counsel agreed at trial that there was no evidence Cabonce's mental illness was caused by alcohol abuse. Furthermore, the expert witness testimony suggested Cabonce's alcohol consumption might have caused his stabbing of the officers, not his mental illness: Dr. Missett noted that Cabonce had been drinking on the day of the stabbing and opined that some of Cabonce's alcohol or substance abuse could have contributed to his behavior; Dr. Cohen could not eliminate alcohol as playing a part in Cabonce's stabbing of the officers; and Dr. Firestone believed Cabonce was drunk at the time, not psychotic.

separate mental illness, then you can consider both the mental illness and the substance abuse in assessing whether or not the defendant was able to know and appreciate the quality or wrongfulness of his actions." The appellate court agreed the instruction was unnecessary, because there was no evidence that the defendant's substance abuse caused or was caused by his bipolar disorder. (*Id.* at p. 61.) Here too, the parties do not cite evidence that Cabonce's intoxication caused or was caused by his mental disorder.

In *U.S. v. Knott* (9th Cir. 1990) 894 F.2d 1119, 1120–1121, the defendant contended that his drinking and drug use in combination with his schizophrenia prevented him from appreciating the nature and quality or wrongfulness of his actions. The Ninth Circuit ruled that, under federal law, he was not entitled to an insanity defense unless his insanity was caused solely by a mental defect and not by a combination of his mental defect and his voluntary intoxication. (*Id.* at p. 1122.) Applying this standard to the matter before us, the trial court's response to the jury's inquiry was correct, because under *Knott* there can be no insanity defense if insanity was caused only primarily, though not entirely, by intoxication.

Cabonce's other arguments on this point are unavailing as well. He asserts that the court's response to the final jury question was erroneous because it did not inform the jury that it could find Cabonce legally insane if his major mental illness caused his intoxication. However, Cabonce did not request such language in the court's response, he does not refer us to any evidence that his intoxication *was* caused by his major mental illness, and the court's response did not in itself preclude the jury from finding Cabonce insane if his mental disease or defect caused his intoxication.

Finally, Cabonce argues that the court's response "impermissibly gave the jury unbridled discretion to determine whether appellant should be found not guilty by reason of insanity." Not so. The jury was instructed with CALJIC Nos. 4.00 and 4.02. CALJIC No. 4.00 informed the jury that a person is legally insane "when by reason of mental disease or mental defect, he was incapable at the time of the commission of the crime" of knowing or understanding the nature and quality of his act or distinguishing what is right from what is wrong. CALJIC No. 4.02 informed the jury of the requirements of legal insanity when the mental disease or defect is due in part to intoxication. Cabonce has failed to establish error in the court's response to the jury's inquiry.

### B. *Applicability of Section 25.5*

Asserting the evidence showed only his intoxication at the time of the incident, Cabonce argues that the court erred if, in fact, section 25.5 does not

apply in that instance. Specifically, Cabonce asserts that, "if the phrase 'abuse of intoxicating substances' in Penal Code section 25.5 is construed narrowly to exclude one-time intoxication," the trial court erred in instructing the jury with the portions of CALJIC Nos. 4.00 and 4.02 and in responding to one of the jury's inquiries with an excerpt from CALCRIM No. 3450.

Section 25.5 bars an insanity defense based solely on addiction to or abuse of intoxicating substances. Here, the prosecutor argued that Cabonce's claimed inability to tell right from wrong, if any, derived from his intoxication on the day of the stabbing. Cabonce did not contend at trial that section 25.5 was inapplicable to the prosecutor's theory or that the jury should not be instructed with the section 25.5-related portions of CALJIC Nos. 4.00 or 4.02. Although defense counsel later objected to the court's reading of a portion of CALCRIM No. 3450, he did not base his objection on the ground that section 25.5 was inapplicable. Nor did he state any meaningful basis for his objection or offer any alternative response to the jury's inquiry.[7] Cabonce cannot now assert instructional error based on the court's inclusion of section 25.5-related language. Accordingly, we need not and do not decide whether the phrase "abuse of intoxicating substances" in section 25.5 includes a single bout of intoxication on the day of the offense.

## C. *Due Process and Jury Trial Rights*

Cabonce contends the court's response to the jury's final question infringed (1) his due process right not to be convicted of crimes committed while he was insane, by making it more difficult for him to establish an insanity defense, (2) his due process rights, by failing to follow state law regarding the insanity defense, and (3) his Sixth Amendment right to a jury trial, by raising the burden of persuasion on his insanity defense and by depriving him of a properly instructed jury.

As discussed *ante*, the court's instructions and responses to the jury's inquiries were not erroneous. There is no reasonable likelihood that the jury applied the instructions or the court's responses in a way that deprived Cabonce of due process or otherwise abridged his constitutional rights. (*Boyde v. California* (1990) 494 U.S. 370, 380 [108 L.Ed.2d 316, 110 S.Ct. 1190]; see *Middleton v. McNeil* (2004) 541 U.S. 433, 437 [158 L.Ed.2d 701, 124 S.Ct. 1830]; *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 112 S.Ct. 475].)

---

[7] Even in this appeal, the parties both contend that the phrase, "abuse of intoxicating substances" in section 25.5 includes instances of one-time intoxication, and Cabonce urges us to assume that it does.

## III. *DISPOSITION*

The judgment is affirmed.

Jones, P. J., and Simons, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 15, 2009, S170569.