Filed 12/14/23  P. v. Gilliam CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C097209 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-F-DV-2018-0012878) |
| v. | |
| FORREST HENRY GILLIAM, | |
| Defendant and Appellant. | |

Defendant Forrest Henry Gilliam shot two of his roommates while they were in their beds early one morning in October 2018.  He was charged with several offenses and entered pleas of not guilty and not guilty by reason of insanity.

1

At the guilt phase, a jury found him guilty of first degree willful, deliberate, and premeditated murder (Pen. Code, § 187, subd. (a)), [1] attempted murder that was willful, deliberate, and premeditated (§§ 664/187, subd. (a)), and unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1)). The jury also found true a firearm enhancement (§ 12022.53, subd. (d)) and a great bodily injury enhancement (§ 12022.7, subd. (e)). In a bifurcated proceeding, the trial court found defendant had a prior serious felony conviction (§ 667, subd. (a)) that qualified as a strike under the three strikes law (§§ 1170.12, subd. (b), 667, subd. (d)).

At the sanity phase, the jury found defendant was legally sane at the time he committed the offenses. Thereafter, in a bench trial, the court found true certain aggravating factors alleged under California Rules of Court,[2] rule 4.421. The court sentenced defendant to an aggregate term of 124 years to life in prison.

Defendant appeals, arguing that reversal is required because substantial evidence does not support the jury's sanity verdict. He contends his sentence violates the prohibition against cruel and unusual punishment under the federal and state Constitutions, and that the trial court erred by failing to dismiss the strike prior finding. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Mental Competency and Bifurcation of Trial*

After a criminal complaint was filed in October 2018 charging defendant with the offenses of conviction, defendant was declared mentally incompetent to stand trial and was committed to the Department of State Hospitals in February 2019. The criminal proceedings were suspended, and defendant was hospitalized at the Atascadero State

---

[1] Undesignated statutory references are to the Penal Code.

[2] All further rule references are to the California Rules of Court.

Hospital for approximately 10 months.  In March 2021, the trial court found defendant mentally competent to stand trial and reinstated the criminal proceedings.  In May 2022, an amended information was filed, and a jury trial commenced shortly thereafter.  As noted, the trial was bifurcated into guilt and sanity phases due to defendant's plea of not guilty by reason of insanity.

*Guilt Phase*

In 2018, defendant and several others lived in a house in Stockton.  Shortly before 6:00 a.m. on October 14, 2018, defendant shot two of his roommates--Gloria and Steven Navarro (mother and son)--while they were in their beds, and then immediately fled the area on foot.[3]  Steven was shot multiple times, including once in his chest.  He was taken to the hospital and survived.[4]  Gloria, who was also shot multiple times, died at the scene from her injuries.

When defendant was arrested later that same day, he was carrying a loaded nine-millimeter handgun, with one round in the chamber and three in the magazine.  A criminalist subsequently determined that the eight shell casings found at the scene, as well as the expended bullets found at the scene and inside the victims' bodies, were fired by that gun.

During his police interview conducted the same day as the shooting, defendant said that he and Steven shared a room for approximately two years and had a sexual relationship, that there were times when Steven touched him in a sexual way while he was asleep (which he did not like), that he shot Gloria because he was angry at her, and

---

[3] Because Gloria and Steven share the same last name, we refer to them by their first names to avoid confusion.

[4] Steven died prior to trial.  His cause of death was unrelated to the injuries he sustained from the shooting giving rise to this case.  At trial, Steven's testimony from the preliminary hearing was admitted.

3

that he told another person about the shooting shortly after it occurred. As for the shooting, defendant explained that he was upset with Gloria because she would take his EBT card[5] and not give it back to him, she decided when he could take a shower, and there were times when she locked him out of the house. At one point, defendant mentioned that he aimed his gun at Gloria before shooting her.

At trial, there was evidence that defendant talked to himself at times "about violence" and that he occasionally made "bizarre statements," including claiming that Steven was his father. There was also evidence that, approximately nine hours before the shooting (around 8:00 or 9:00 p.m. on October 13, 2018), defendant was at home and "appeared stressed"; his face looked serious or angry.

Defendant testified on his own behalf at trial as the sole defense witness. He testified that he and Steven had a sexual relationship, he took medication for schizophrenia (Zyprexa), and Steven had sexually assaulted (sodomized) him multiple times while he was asleep. In response to one of the incidents, defendant hit Steven with a glass cup. Defendant also claimed that, prior to the shooting, he believed Steven was his biological father, Steven had "[s]hot [his] teeth out with a .22 gardener," and there were implants in his teeth that allowed him to be tracked by "GPS."

As for the shooting, defendant explained that he had used methamphetamine and "blacked out" around the time he shot Steven, although defendant remembered that he shot at Steven three times after he retrieved his backpack. Defendant also recalled that Gloria yelled, "Get out" after Steven was shot, that he shot Gloria twice because he believed she was "going for a weapon," that he fled the scene immediately after the shooting, that he went to a friend's house and admitted to shooting Steven, and that his gun was fully loaded (eight bullets) prior to the shooting and contained four bullets when

---

[5] An EBT (electronic benefit transfer) card is a state-issued card that provides food assistance to low-income individuals.

4

it was seized by the police later that same day, with one round in the chamber and three in the magazine.

At trial, defendant claimed that he no longer believed Steven was his biological father, but maintained that Steven had shot him in the mouth. When asked, defendant admitted that he was angry the night before the shooting and did not sleep at his house that night. Defendant also admitted that he had suffered four prior felony convictions: (1) a 2006 conviction for robbery (§ 211); (2) a 2007 conviction for receiving stolen property (§ 496, subd. (a)); (3) a 2008 conviction for driving or taking a vehicle without the owner's consent (Veh. Code, § 10851, subd. (a)); and (4) a 2012 conviction for unlawful possession of ammunition by a felon (§ 30305, subd. (a)(1), formerly § 12316, subd. (b)(1)).

On cross-examination, defendant acknowledged that he understood that a person shot in the chest would be "damage[d]."

*Sanity Phase*

Following defendant's convictions at the guilt phase, the same jury heard the trial of defendant's insanity defense. Four experts testified as to defendant's mental condition--two defense experts (Theresa Fraser, Ph.D. (psychology) and Richard Blak, Ph.D. (psychology)), and two court-appointed experts (Gary Cavanaugh, M.D. (psychiatry) and Wendy Weiss, Ph.D. (psychology)). It was undisputed that defendant had a history of substance abuse, and that, at the time of the shooting, he was 30 years old and experiencing the effects of methamphetamine. The principal disagreement among the experts was whether defendant was suffering from schizophrenia exacerbated by drug use or methamphetamine-induced psychosis. As we next explain, Dr. Blak concluded defendant was legally insane at the time of the shooting due to the effects of schizophrenia and methamphetamine. Dr. Cavanaugh disagreed with this conclusion, finding that defendant was not suffering from schizophrenia but rather psychosis induced

5

by methamphetamine.  Dr. Weiss agreed with Dr. Cavanaugh.  Dr. Fraser did not offer an opinion on the issue of insanity.

*Defense Experts*

Dr. Fraser, a forensic psychologist employed by the Department of State Hospitals, testified that defendant was a patient at the Atascadero State Hospital from May 2019 to March 2020.  Dr. Fraser explained that, shortly after defendant's arrival, there was evidence suggesting he was experiencing hallucinations.  Defendant discussed what appeared to be delusional beliefs, and demonstrated some thought disorganization when discussing those beliefs.  Over the course of his hospitalization, defendant claimed his brothers had placed implants into his teeth, which caused rotting and worms and maggots to come out of holes in his teeth.  Defendant also claimed that he had been shot in the mouth, which caused the implants to leak poison, that his brothers had provided an AK-47 to one of the victims, that Gloria was not dead, that his brothers had placed a chastity belt on him, and that he heard Gloria's voice sometimes.

Dr. Fraser diagnosed defendant with schizophrenia, antisocial personality disorder, and amphetamine and cannabis use disorder.  Dr. Fraser noted that defendant was prescribed an antipsychotic medication (Zyprexa), which is primarily used to treat psychotic symptoms and can have a mood stabilizing effect.  Defendant was initially given a 10-milligram dose, which was increased to 45 milligrams over time.  Although defendant showed steady improvement, he was still experiencing delusions at the time he was discharged from the hospital.  Dr. Fraser did not opine on whether, at the time of the shooting, defendant was legally insane.  As for whether defendant's mental condition was caused by substance abuse, Dr. Fraser noted that, in a typical case, most symptoms related to a substance-induced psychosis resolve six months after a person stops using.  Thus, she opined defendant's mental illness was not induced by substance abuse, as he continued to experience delusions throughout his hospitalization (even while taking antipsychotic medication), which is "more characteristic of a schizophrenia spectrum

6

disorder as opposed to just strictly a very short term substance-induced psychotic disorder."

However, Dr. Fraser noted that defendant's history of daily drug use (cannabis and methamphetamine) "seemed to cause clinically significant problems" for him (e.g., he was unable to maintain a job or stable living situation), and that methamphetamine can induce psychotic symptoms, which can be temporary or "become[] a more settled and stable psychotic disorder turning into schizophrenia, basically." Dr. Fraser also noted that defendant was impaired in "various different cognitive domains." For example, defendant's ability to communicate and "understand language" was significantly below average and he was unable to process information in an effective manner. Defendant's memory was also impaired, and he had difficulty focusing and concentrating, which Dr. Fraser acknowledged could have been caused by substance abuse. Although she acknowledged that she did not conduct any tests to determine whether defendant was malingering, she noted that she did not observe anything indicating as much.

Dr. Blak, a clinical and forensic psychologist, concluded that defendant suffered from schizophrenia and substance-abuse disorder (cannabis and methamphetamine) at the time of the shooting. In reaching his conclusion as to schizophrenia, Dr. Blak explained that defendant had a history of psychotic symptoms (e.g., delusions), and that defendant's delusions were fixed or "consistent" (i.e., the same over time) When interviewed in May 2022, defendant was experiencing the same delusions he described when he was hospitalized following the shooting. Dr. Blak noted that defendant believed (among other things) that his brothers had shot him in the mouth, and that he needed to carry a gun to protect himself from his brothers.

When Dr. Blak was asked to explain how he concluded defendant was suffering from schizophrenia rather than psychosis induced by substance abuse, he said: "In my experience people suffering from a severe mental disorder, which schizophrenia is, often self-medicate with street drugs. And so the two can go together, there isn't one versus

7

the other. There's evidence, in my opinion, for both diagnoses to be identified. And so he had a history of these signs and symptoms. He did not go to get psychiatric care while he was living in the community as far as I could tell. And so he relied on the cannabis and methamphetamine to self-medicate to feel a bit better." In response to a similar question, Dr. Blak stated: "Well, I don't think it's one or the other. I think you can be in a particular state in terms of how you're psychologically organized, if that's the way to say it, and then when you use methamphetamine, which is a disinhibitor which allows people then to act without much rational thinking about it, and so they work kind of like a perfect storm. You've already got somebody's like trouble perceiving and understanding things in an accurate manner, then they have some sort of aggressive feeling, for example, anger. And the [prefrontal] cortex is a part of the brain that's called the executive functioning which has to do with putting the brakes on impulse. So somebody may feel anger rather than thinking about a different way of resolving the problem. They don't modulate the aggression, so they act out aggressively because they don't know how to put the brakes on the urge."

In determining that defendant was not merely suffering from methamphetamine-induced psychosis, Dr. Blak reasoned as follows: "Basically you have a history of signs and symptoms of schizophrenia, you have auditory hallucinations, you have delusions. So the issue is if it's just substance induced psychosis then he would clear up sooner or later. And the fact he spent ten months at Atascadero tells that it didn't clear up very quickly at all, and he was on a high dose of Zyprexa, an antipsychotic medication which then is continued to this day. [¶] And although when I saw him for the interview . . . he was respectful and polite, but he still had symptoms of schizophrenia. So that tells me that those, schizophrenia was the major contributor or the nexus of his interaction with his relationships that led to his offense."

Dr. Blak concluded that defendant was legally insane because he was suffering from a mental illness (schizophrenia) that prevented him from knowing the nature and

quality of his actions and from being able to distinguish right from wrong at the time of the shooting. Dr. Blak noted that defendant claimed he had no memory of what he did (including using a firearm), although Dr. Blak acknowledged that defendant testified at the guilt phase that he shot Gloria and Steven.

When asked, Dr. Blak stated that he did not see any evidence that defendant was malingering. He indicated defendant was "in the low to below average intelligence level."

*Court-Appointed Experts*

Dr. Cavanaugh, a psychiatrist, concluded that, at the time of the shooting, defendant suffered from methamphetamine-induced psychotic disorder, methamphetamine and cannabis use disorder, and severe antisocial personality disorder.[6] In disagreeing with Dr. Blak's schizophrenia diagnosis, Dr. Cavanaugh explained that defendant had no history of or treatment for schizophrenia, even though he had "been in situations where outside people could assess" his mental state, and that the symptoms defendant described were consistent with methamphetamine-induced psychotic disorder. Dr. Cavanaugh further explained that psychotic symptoms caused by methamphetamine are similar to symptoms exhibited by persons with schizophrenia, and that while psychotic symptoms from methamphetamine usually subside after a few days of nonuse, "there are times with a long enough history of usage, or extended usage where the psychotic symptoms don't go away after the person has stopped using." Dr. Cavanaugh

---

[6] Dr. Cavanaugh interviewed defendant in September 2021. During his testimony, Dr. Cavanaugh explained that he previously interviewed defendant in 2008 in connection with a competency hearing in an unrelated criminal matter. In that case, Dr. Cavanaugh found no "evidence of delusions or hallucinations," and concluded that defendant had "no psychotic disorder whatsoever." Dr. Cavanaugh determined that defendant--who had a history of methamphetamine use and academic problems--was suffering from antisocial personality disorder, which is a pattern of behaviors resulting in a failure to follow the rules, regulations, and structure of society.

noted that the manual used by psychiatrists to diagnose mental illnesses[7] "says that you can't really make [a schizophrenia] diagnosis in the face of chronic methamphetamine usage because they create conditions that look exactly the same."

When Dr. Cavanaugh was asked whether defendant was capable of knowing and understanding the nature and quality of his acts on the day of the shooting, he explained: "[T]hat is a tough one, because I mean, you know, generally acts that are committed when under the influence of substances are generally not allowed to be covered by a [legal insanity] assessment. I certainly think he was not able to think through his actions, there's no doubt about that. Since I did not really see him at the time, I can't be certain about this, but he probably was not aware that it was wrong, but that's based on methamphetamine psychotic disorder, not schizophrenia. Thus, it's a substance related offense."

Upon further questioning, Dr. Cavanaugh opined that defendant "understood" and "knew what he was doing" on the day of the shooting, but might not have realized it was wrong based on the effects from the methamphetamine. Noting that defendant heard voices and became angry after using methamphetamine, Dr. Cavanaugh concluded that defendant was legally sane because he did not have a "mental disorder other than the methamphetamine induced psychotic disorder."

Dr. Weiss, a forensic psychologist employed by the Board of Parole Hearings, concluded that defendant was suffering from methamphetamine-induced psychosis and was not legally insane at the time of the shooting. In so concluding, Dr. Weiss explained that, based on her interviews with defendant[8] and the materials she reviewed (e.g.,

---

[7] Diagnostic and Statistical Manual of Mental Disorders.

[8] Dr. Weiss interviewed defendant in October and December 2021. During these interviews, defendant denied any history of mental health treatment and denied that he had ever been diagnosed with a mental disorder. Defendant explained that he began

medical and psychiatric records, police report, expert reports, competency evaluations (conducted in 2018 and 2020), defendant "did not appear to lack an ability to understand and appreciate his behavior due to a mental disorder, disease, or defect." Dr. Weiss further explained: "Maybe there was some distortions. I believe it was the result of the methamphetamine intoxication or maybe there were no distortions. . . . I think there might have been some perceptual distortions, but I believe they were the result of the methamphetamine intoxication."

When Dr. Weiss was asked whether she considered other reasons for defendant's psychosis, she said: "I would always consider other reasons when appointed to do an insanity evaluation. Somebody had raised an issue about whether [defendant] had some mental health problems that caused or contributed to the behavior or distorted perceptions that contributed to the behavior, so of course I consider that. There were very few statements that [defendant] . . . made or were available in the records that I reviewed to suggest that, but I certainly considered whether this was the result of a mental disorder, and I didn't see evidence of that." She added that she did see evidence defendant acted in a "purposeful, goal directed way" on the day of the shooting, which "revealed a more calculated consideration of what he was doing."

When questioned about how defendant's methamphetamine use, which predated his purported auditory hallucinations, impacted her conclusion that defendant was suffering from methamphetamine-induced psychosis, Dr. Weiss stated: "[Defendant's] methamphetamine abuse in my opinion likely precipitated the onset of a mental illness. . . . [H]aving read all the records, I think that he has developed a mental illness

---

using cannabis at age 12 and methamphetamine at age 14, was using methamphetamine daily at the time of the shooting, and was experiencing the effects of methamphetamine when he shot Steven and Gloria. Defendant also reported that he began experiencing auditory hallucinations six years earlier, which Dr. Weiss noted is a symptom consistent with methamphetamine use.

over time. The etiology is, I can't say with certainty that it's because he used methamphetamine. Perhaps he would have developed this disorder anyhow. It would certainly exacerbate it, his perceptual distortions and hallucinations and delusions that he has reported were certainly exacerbated and magnified if not solely caused by the methamphetamine use and intoxication."

## DISCUSSION

### I

### *Sanity Verdict*

Defendant argues there is insufficient evidence to support the jury's sanity verdict. He claims there is no substantial evidence that he was legally sane at the time of the shooting, as the opinions of Dr. Cavanaugh and Dr. Weiss "were not grounded in the facts of the case." We are not persuaded.

A. *Applicable Legal Principles and Standard of Review*

If a defendant pleads both not guilty and not guilty by reason of insanity, the trial is bifurcated into guilt and sanity phases. In the guilt phase, the defendant is conclusively presumed to have been legally sane at the time of the offense. (*People v. Elmore* (2014) 59 Cal.4th 121, 140-141; § 1026, subd. (a).) If the defendant is found guilty, the trial proceeds to the sanity phase, in which the defendant has the burden to prove he was legally insane by a preponderance of the evidence. (*Elmore*, at p. 141; §§ 1026, subd. (a), 25, subd. (b).)

Under California law, persons who are mentally incapacitated are deemed incapable of committing crimes. (§ 26; *People v. Powell* (2018) 5 Cal.5th 921, 955.) Mental incapacity is determined by the *M'Naghten* test for legal insanity set forth in section 25, subdivision (b). (*Powell*, at p. 955.) Under *M'Naghten*, legal insanity is established if the defendant had a mental disease or defect when he committed the crimes, and because of that disease or defect, he was incapable of either knowing or understanding the nature and quality of his acts or was incapable of knowing or

12

understanding that his acts were morally or legally wrong. (§ 25; subd. (b); *Powell*, at p. 955; *People v. Elmore*, *supra*, 59 Cal.4th at p. 140; CALCRIM No. 3450.)[9] The defendant's insanity does not need to be permanent in order to establish a defense. The relevant inquiry is the defendant's mental state at the time the crimes were committed. (*People v. Kelly* (1973) 10 Cal.3d 565, 577.)

"A defendant may not be found insane solely on the basis of addiction to, or abuse of, intoxicating substances. (§ 29.8.) This provision 'makes no exception for brain damage or mental disorders caused solely by one's voluntary substance abuse but which persists after the immediate effects of the intoxicant have dissipated. Rather, it erects an absolute bar prohibiting use of one's voluntary ingestion of intoxicants as the sole basis for an insanity defense, regardless whether the substances caused organic [brain] damage or a settled mental disorder which persists after the immediate effects of the intoxicant have worn off.' " (*People v. McCarrick* (2016) 6 Cal.App.5th 227, 247; see also *People v. Robinson* (1999) 72 Cal.App.4th 421, 427 [discussing former § 25.5 before it was renumbered § 29.8].) However, "[w]here the mental disease or defect is caused *in part* by an addiction or abuse of alcohol" a legal insanity defense is still available "depending on whether the defendant proves that it was his mental disease or defect that caused him to be unable to tell right from wrong." (*People v. Cabonce* (2009) 169 Cal.App.4th 1421, 1436; see CALCRIM No. 3450 ["If the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, that settled mental disease or defect combined with another mental disease or defect may qualify as legal insanity.

_____

[9] Subdivision (b) of section 25 states that a person can be found legally insane only if "he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." Our Supreme Court has interpreted this statutory language to mean that legal insanity can be shown under *either* the " 'nature and quality' " prong *or* the " 'right from wrong' " prong of the test. (*People v. Powell*, *supra*, 5 Cal.5th at p. 955, fn. 11.)

A *settled mental disease or defect* is one that remains after the effect of the drugs or intoxicants has worn off"].)

Only "individuals rendered insane solely because of their substance abuse should be treated differently than those afflicted by mental illness through no conscious volitional choice on their part." (*People v. Robinson*, *supra*, 72 Cal.App.4th at p. 428.) "Thus, there can be no insanity defense when the inability to tell right from wrong derived (1) solely from an addiction or abuse of intoxicating substances, *or* (2) from a mental defect or disorder that itself was caused solely by such addiction or abuse." (*People v. Cabonce*, *supra*, 169 Cal.App.4th at p. 1434.)

We review a jury's sanity determination for substantial evidence. (*People v. Powell*, *supra*, 5 Cal.5th at pp. 956-957.) We review the entire record in the light most favorable to the jury's determination and affirm that determination if it is supported by evidence that is reasonable, credible and of solid value. (*Id*. at p. 957.) "We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

B. *Analysis*

We see no basis for reversal. On the record before us, a reasonable jury could have found that defendant failed to prove he was legally insane at the time of the shooting by a preponderance of the evidence. "Because the defendant has the burden of proof on the issue of insanity, 'the question on appeal is not so much the substantiality of the evidence favoring the jury's finding as whether the evidence contrary to that finding is of such weight and character that the jury could not reasonably reject it.' " (*People v. McCarrick*, *supra*, 6 Cal.App.5th at pp. 247-248.) This standard has not been satisfied here. While the defense experts (Dr. Fraser and Dr. Blak) agreed that defendant suffered from a severe mental illness (schizophrenia), that fact does not conclusively establish that defendant was legally insane when he shot Steven and Gloria. (*People v. Powell*, *supra*,

5 Cal.5th at p. 955.) On this issue, the court-appointed experts (Dr. Cavanaugh and Dr. Weiss) disagreed with Dr. Blak. They concluded that defendant was not suffering from schizophrenia but rather methamphetamine-induced psychosis. Defendant asserts that Dr. Cavanaugh's and Dr. Weiss's opinions were flawed because they failed to consider certain evidence "bearing upon his sanity." However, "[i]t was for the jury to evaluate the testimony of the experts, examine the bases for their opinions and determine whom to believe." (*People v. Chavez* (2008) 160 Cal.App.4th 882, 891.) As our Supreme Court has explained, "The issue of legal sanity is . . . a complex and uncertain one about which fully competent experts can reasonably disagree." (*Powell*, at p. 958.) After considering the evidence presented, the jury found that defendant was legally sane at the time of the shooting. Providing the experts were adequately qualified, which defendant did not dispute, the jury was entitled to evaluate and weigh their opinions. (*Ibid.*) Nothing more is required to uphold the jury's sanity verdict (*ibid.*), and there is no legal basis for us to disturb that verdict.

## II

### *Alleged Sentencing Errors*

Defendant raises two claims of sentencing error, which we address in turn. As we shall explain, we find no merit in these claims.

A. *Cruel and Unusual Punishment*

As noted *ante*, defendant was sentenced to 124 years to life in prison. On appeal, defendant argues that his sentence (which is the functional equivalent of life without the possibility of parole) constitutes cruel and unusual punishment under the federal and state Constitutions because multiple experts determined he was incapable of understanding the nature and quality of his acts and he did not know the difference between right and wrong at the time of the shooting.

15

## 1. *Applicable Legal Principles*

The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Similarly, the California Constitution provides: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." (Cal. Const., art. I, § 17.)

" ' "The cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution prohibits the imposition of a penalty that is disproportionate to the defendant's 'personal responsibility and moral guilt.' [Citations.] Article I, section 17 of the California Constitution separately and independently lays down the same prohibition." ' " (*People v. Lucero* (2000) 23 Cal.4th 692, 739.)

Under the Eighth Amendment, "challenges to the length of term-of-years sentences" are reviewed by first "comparing the gravity of the offense and the severity of the sentence." (*Graham v. Florida* (2010) 560 U.S. 48, 59-60.) "This analysis can consider a particular offender's mental state and motive in committing the crime, the actual harm caused to his victim or to society by his conduct, and any prior criminal history." (*Id.* at p. 88 (conc. opn. of Roberts, C.J.).) " '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." (*Id.* at p. 60.)

The federal and state approaches to cruel and unusual punishment claims largely "overlap" and both use " 'gross disproportionality' " as their " 'touchstone.' " (*People v. Baker* (2018) 20 Cal.App.5th 711, 733.) In assessing proportionality under California law, courts examine three criteria: (1) the nature of the offense and offender, with emphasis on his danger to society; (2) the penalty imposed compared with the penalties

for more serious crimes in California; and (3) the punishment for the same offense in other jurisdictions. (*In re Lynch* (1972) 8 Cal.3d 410, 425-427, superseded by statute on other grounds as stated in *People v. Caddick* (1984) 160 Cal.App.3d 46, 51; *Baker*, at p. 723.) " 'Disproportionality need not be established in all three areas.' " (*Baker*, at p. 723.) Here, defendant focuses on the first criterion in his appellate briefing, omitting any meaningful discussion of the second and third criteria. We do the same.

"[A] reviewing court must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including . . . age, prior criminality, and mental capabilities. [Citation.] If the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], so that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional." (*People v. Lucero*, *supra*, 23 Cal.4th at pp. 739-740; *People v. Boyce* (2014) 59 Cal.4th 672, 721-722.)

"Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment." (*In re Lynch*, *supra* 8 Cal.3d at pp. 423-424.) "Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494; see *Rummel v. Estelle*

(1980) 445 U.S. 263, 272 ["Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare"].)

" 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' " (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358; see also *People v. Edwards* (2019) 34 Cal.App.5th 183, 190.)

2. *Analysis*

As an initial matter, we agree with the People that defendant has forfeited his claim of error. (See *People v. Brewer* (2021) 65 Cal.App.5th 199, 212 [failure to raise cruel and unusual punishment claim at sentencing results in forfeiture on appeal].) But even if we were to overlook forfeiture, defendant's claim fails on the merits.

Our Supreme Court has repeatedly rejected claims that a defendant's severe mental illness categorically prohibits the death penalty, regardless of the circumstances of the crime. (See, e.g., *People v. Steskal* (2021) 11 Cal.5th 332, 373-374; *Boyce, supra*, 59 Cal.4th at pp. 721-722.) The high court has also rejected claims that a defendant's low IQ, brain damage, and/or mental illness rendered a death sentence grossly disproportionate to his crime. (See *Boyce,* at pp. 719-721 [discussing cases and rejecting claim that death penalty was disproportionate in light of the defendant's schizotypal disorder and subaverage intelligence].) In assessing the constitutionality of a death sentence on a mentally ill defendant, "we examine *the circumstances of the offense*, including the defendant's motive, the extent of his involvement in the crime, the manner in which it was committed, and the consequences of his acts, as well as the defendant's age, prior criminality, and mental capabilities." (*Id*. at p. 721.)

While we agree with defendant that, as a practical matter, his sentence is equivalent to life without the possibility of parole, we cannot conclude that it " ' " 'shocks the conscience and offends fundamental notions of human dignity.' " ' " (*Lucero, supra,* 23 Cal.4th at p. 740; see *People v. Sullivan* (2007) 151 Cal.App.4th 524,

18

572 [fact that sentence of 210 years to life meant defendant would spend rest of his life in prison did not render it cruel and unusual].)  The jury found that defendant deliberately (and with premeditation) shot two of his roommates multiple times early one morning while they were in bed, killing one of them.  There was evidence that defendant had a long history of substance abuse, using methamphetamine made him angry, he was suffering from methamphetamine-induced psychosis and antisocial personality disorder at the time of the shooting, and he engaged in purposeful, goal directed behavior in connection with the shooting, including aiming for Gloria's body and immediately fleeing the scene.  There was also evidence of motive; defendant admitted in his police interview that he was angry at Gloria and Steven for various reasons.  At no point did defendant express any remorse for the shooting.  And the record reflects that defendant had a long history of antisocial behavior, including (among other things) "fighting with peers" during his childhood, "involvement with the juvenile justice system," and four felony convictions as an adult.  As the trial court observed, defendant's current offenses-- shooting two unarmed, defenseless victims--and criminal history evince that he is a clear threat to society.  (See *People v. Stone* (1999) 75 Cal.App.4th 707, 715 [recidivism poses a manifest danger to society, justifying the imposition of longer sentences for subsequent offenses].)  Indeed, defendant's ongoing criminality shows an inability to follow the law, with tragic consequences.  Defendant points to nothing in the record suggesting that his mental condition played a role in his decision to shoot the victims.  (*Boyce, supra*, 59 Cal.4th at p. 720 ["Although defendant offered evidence of his schizotypal disorder and subaverage intelligence, there was no evidence that either condition played any role in the killing"].)

In short, after considering the relevant factors, this is not one of those "rarest of cases" in which we could "declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*People v. Martinez, supra*, 76 Cal.App.4th at p. 494.)  Therefore, defendant's cruel and unusual punishment claim fails.

B. *Strike Prior Finding*

Next, defendant argues the trial court erred in failing to dismiss the strike prior finding under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*). In making this argument, defendant acknowledges that he did not specifically request or invite the trial court to grant such relief. Nonetheless, he asserts that his claim of error is cognizable because the trial court should have construed his sentencing memorandum, which requested dismissal of all *enhancements* pursuant to Senate Bill No. 81 (2021-2022 Reg. Sess.) as an invitation to dismiss the strike prior finding under *Romero*. We see no basis for reversal.

1. *Applicable Legal Principles*

Under section 1385, subdivision (a), a trial court, on its own motion or upon the prosecutor's application, has the power to strike or vacate a finding under the three strikes law that a defendant has a prior serious and/or violent felony conviction, "in furtherance of justice." (*People v. Carmony* (2004) 33 Cal.4th 367, 373 (*Carmony*).) A defendant has no right to make such a motion, and the court has no obligation to make a ruling, but a defendant "does have the right to 'invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading, and the court must consider evidence offered by the defendant in support of his assertion that the dismissal would be in furtherance of justice.' " (*Id.* at p. 375.) In exercising its discretion to dismiss a strike prior finding, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

Effective January 1, 2022, Senate Bill No. 81 amended section 1385 to add subdivision (c) (Stats. 2021, ch. 721, § 1), which provides, in part:

20

"(c)(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

"(2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the [listed] mitigating circumstances . . . are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."

The mitigating circumstances listed in subdivision (c) of section 1385 include, as relevant here, that "[m]ultiple enhancements are alleged in a single case," "[t]he application of an enhancement could result in a sentence over 20 years," "[t]he current offense is connected to mental illness," and "[t]he enhancement is based on a prior conviction that is over five years old." (See § 1385, subd. (c)(3)).)

2. *Analysis*

We agree with the People that defendant has forfeited his claim of error. (*Carmony*, *supra*, 33 Cal.4th at pp. 375-376 ["[A]ny failure on the part of a defendant to invite the court to dismiss under section 1385 following *Romero* waives or forfeits his or her right to raise the issue on appeal."]; *People v. Scott* (1994) 9 Cal.4th 331, 352-353 [forfeiture results where a defendant fails to object to a trial court's discretionary sentencing choices].) Contrary to defendant's suggestion, the trial court did not err in failing to treat his motion to dismiss all *enhancements* pursuant to Senate Bill No. 81 as including a request or invitation to dismiss the strike prior finding. (*People v. Burke* (2023) 89 Cal.App.5th 237, 243 ["the Three Strikes law is not an enhancement; it is an alternative sentencing scheme for the current offense"]; *People v. Williams* (2014) 227 Cal.App.4th 733, 744 [the three strikes law is a penalty provision, not an enhancement, as it does not add an additional term of imprisonment to the base term]; see also *Romero*,

21

*supra*, 13 Cal.4th at p. 527 [the three strikes law "articulates an alternative sentencing scheme for the current offense rather than an enhancement"].)

Forfeiture aside, defendant has not demonstrated that the trial court's sentencing decision was an abuse of discretion. (*Carmony*, *supra*, 33 Cal.4th at pp. 375-376 [failure to dismiss strike prior subject to review for abuse of discretion].) Here, defendant's prior strike was a 2006 conviction for robbery. At sentencing, the trial court observed that defendant had "multiple prior felonies,"[10] and refused his request to strike the enhancements due to (among other things) mental illness. In doing so, the court explained that "the most important overriding consideration" for sentencing was that defendant presented "a clear threat to society," as he shot two defenseless people in "cold blood" while they were in bed early in the morning. With respect to the strike prior, the trial court stated: "[A]s far as the strike -- whether to impose the strike or not -- it's only 12 years old, which isn't that old. Plus, he was imprisoned for that for a certain amount of time. But I think it's a very recent strike prior. And, once again, he is a clear threat to society, which I think is the overriding factor for sentencing." In imposing consecutive sentences for the murder and attempted murder convictions, the court stated: "I believe [defendant] should be imprisoned for as long as possible as a result of this incident." The court acted within its discretion in implicitly finding that defendant fell within the spirit of the three strikes law. We cannot say the sentencing decision was irrational or arbitrary.[11]

---

[10] In addition to the four felony convictions identified *ante*, defendant also suffered a 2007 misdemeanor conviction for possession of a switchblade, (§ 21510, formerly § 653k), and a 2010 conviction for violating the federal larceny statute (18 U.S.C. § 641).

[11] Because we have rejected defendant's claims of sentencing error on the merits, we need not and do not consider his ineffective assistance of counsel arguments.

## DISPOSITION

The judgment is affirmed.

/s/
Duarte, Acting P. J.

We concur:


/s/
Renner, J.


/s/
Krause, J.