[No. F029825. Fifth Dist., May 21, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
HENRY WAYNE ROBINSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II. and III.

**COUNSEL**

Charles M. Bonneau, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Stan Cross and Erik R. Brunkal, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BUCKLEY, J.**—Defendant was found guilty after bifurcated jury trial of first degree murder, attempted murder, attempted robbery and burglary, and was found to have personally used a firearm during the commission of each offense. He was thereafter found to have been sane during the commission of the offenses. Defendant admitted three prior convictions within the meaning of the three strikes law. He was sentenced to life imprisonment plus 22 years.

In the published portion of this appeal we conclude that a special instruction based on Penal Code section 25.5[1] should not have been given during the sanity phase of the trial. In relevant part, section 25.5 references findings of insanity based solely on the abuse of intoxicating substances. Defendant did not rely on his long-term substance abuse and possible resulting mental damage or disorder as the sole cause of his insanity. Therefore, section 25.5 had no application to the instant case and for this reason the special instruction should have been refused. However, we find the error to be harmless; it is not reasonably probable the jury would have returned a more favorable verdict had the instruction been refused. In the unpublished portion of this appeal we reject defendant's remaining claims of instructional error. Accordingly, we will affirm.

### FACTS

Princess Davis testified that she lived across the street from Marv's Liquors in Bakersfield. During the afternoon of March 18, 1994, defendant and another man drove to her apartment in a brown two-tone Cadillac and visited with her for approximately thirty minutes. They asked her how many people worked at Marv's Liquors, where the money was hidden and whether the store's employees were armed. Ms. Davis had the impression they were planning to rob the store. She refused to answer their questions. Defendant appeared to be drunk. His speech was slurred. Ms. Davis did not find his condition unusual; defendant usually appeared to be drunk when she saw him. At one point during the visit, defendant went into Marv's Liquors and purchased two beers. He drank one in her presence.

David Aezah testified that on March 18, 1994, he was working with Ahmed Gaber at the D.A. Market in Bakersfield. Gaber was standing behind the front register; Aezah was sitting behind the meat counter and could not be seen from the front door. At approximately 7:00 p.m. defendant entered the store. He was wearing sunglasses and had a bandanna on his head. Aezah

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

recognized defendant because he had been a customer on many occasions. Another Black man entered the store at the same time as defendant but left almost immediately. Defendant approached the counter where Gaber was standing. Aezah heard defendant ask Gaber the prices of different types of liquor. Suddenly, Aezah heard a shot and Gaber fell to the floor. Aezah stood and grabbed for his gun. Defendant turned his gun on Aezah and fired. Aezah returned fire and defendant fled. Gaber died soon thereafter.

At approximately 7:15 p.m., Kern County Deputy Sheriff Robert Allen, who was assigned to helicopter observation duty, spotted a brown two-tone Cadillac traveling at a high rate of speed near the area where the D.A. Market is located. He followed the vehicle and observed two males exit the vehicle and run off in different directions. Search of the Cadillac revealed a black bandanna and a pair of sunglasses. There were bloodstains on the backseat. Prints taken from the sunglasses and from the passenger-side door matched defendant's fingerprints.

Later that evening Aezah gave investigators a photograph of defendant which he had procured from a former employer. Aezah knew where defendant lived and took the police there. Defendant was not home.

Defendant was detained the following day. His arm was wrapped in a bloody bandage. He was arrested after Aezah identified him during a field lineup.

Serology tests revealed that blood samples collected from the Cadillac had the same genetic markers as defendant's blood.

## DISCUSSION

I. *Giving of special instruction based on section 25.5 during sanity phase was harmless error.*

The People originally sought to impose the death penalty. Prior to defendant's arrest for the instant offenses, he had no documented history of mental illness or psychiatric problems. However, five months after his arrest and with trial looming, defendant suddenly began to develop symptoms of mental disturbance. Defense counsel declared a doubt as to defendant's competence on four separate occasions. Proceedings were suspended each time while defendant's competence was assessed. Defendant was twice found unable to assist in his defense and was briefly committed to Patten State Hospital on both occasions. Defendant was found competent to stand trial for the third time on May 1, 1997; on May 6, 1997, the People advised

the trial court that the death penalty would no longer be sought in this case. No further doubts about defendant's competency were declared.

Three witnesses were called during the sanity phase of the trial, all of whom were psychiatric experts. Drs. Haddock and Middleton testified for the defense; Dr. Estner testified for the prosecution. Drs. Haddock and Middleton each testified that in his opinion defendant was legally insane on the day of the offenses. Dr. Estner testified that in his opinion defendant was sane.

In relevant part, Dr. Haddock testified that defendant suffered from "a psychotic disorder" in 1994. Tests he administered to defendant showed "indications of a depressive condition" and anxiety, borderline mental retardation, and a "history of long-term addiction to alcohol and drugs." Defendant "presents as a syndrome, syndrome meaning there are a number of factors that have to be considered which include his intelligence, behavior at the time of the crime and his long-term addiction."

Dr. Middleton testified that his opinion was based on reports of defendant's interaction with other mental health professionals in 1994. These reports "are consistent with a man who is severely affected by a psychotic disorder, disorganized thinking." Like Dr. Haddock, Dr. Middleton referenced an unspecified psychosis, low intelligence, and drug and alcohol abuse as causative factors. Dr. Middleton also testified that the results of a screening test administered to defendant were "consistent with somebody who might have organic brain damage."

In contrast, Dr. Estner testified that he "didn't see any intersection . . . of mental illness" with the crimes. He believed defendant was malingering.

Over objection by defendant, the trial court agreed to give a special instruction based on section 25.5. This section, which was enacted as an urgency statute, effective November 30, 1994, provides: "In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, this defense shall not be found by the trier of fact *solely on the basis of* a personality or adjustment disorder, a seizure disorder, *or an addiction to, or abuse of, intoxicating substances.* This section shall apply only to persons who utilize this defense on or after the operative date of the section." (Italics added.)[2]

Defense counsel argued that because the instant offenses were committed prior to the operative date of the statute it was ex post facto as to him. The

---

[2]As given, the special instruction provided, " '[A] person shall not be found to be legally insane solely on the basis of personality or adjustment disorder, a seizure disorder or an addiction to or abuse of intoxicating substances.' "

court rejected this argument and also concluded there was no potential for confusion between this instruction and an instruction on insanity by intoxication (CALJIC No. 4.02) because defendant was not relying solely on intoxication as the cause of his insanity. In relevant part, the court explained, "[t]he defense position is not, as I understand it and as argued today, that [defendant] is insane solely because of the abuse of alcohol and the abuse of drugs but rather it is a combination of factors which to be sure includes those circumstances but also includes the borderline mental retardation." When given the opportunity to comment, defense counsel did not contest the court's remark that it was defendant's position that his insanity had multiple causative factors.

 On appeal, defendant reasserts his argument that instruction in the language of section 25.5 should not have been given because the statute became effective after defendant committed the instant offenses. He further argues that there was no debate below whether his insanity was based solely on intoxication and therefore the instruction was unnecessary.[3] Respondent contends that since this statute merely codified previously existing law with respect to voluntary intoxication and insanity, the effective date of the statute is irrelevant.

As will be explained below, we conclude that because defendant did not present evidence showing that his insanity was solely caused by his intoxication or a settled mental defect resulting from his substance abuse, section 25.5 had no application to the evidence and the special instruction should have been refused for this reason.[4] Yet, we also conclude that there is no reasonable probability that the verdict would have been more favorable if the instruction had been refused. Hence, the error was harmless.

In 1993, this court published *People* v. *Randolph* (1993) 20 Cal.App.4th 1836 [25 Cal.Rptr.2d 723], which held that refusal of CALJIC No. 4.02 (legal definition of insanity) was proper because the record did not contain substantial evidence supporting the conclusion that defendant suffered from a mental defect which remained after the effects of his voluntary consumption of intoxicants had dissipated. We set forth the existing state of the law as it relates to substance abuse and insanity: "In *People* v. *Kelly* (1973) 10 Cal.3d 565, 574-575 . . . , the Supreme Court, acknowledging that a person cannot be convicted for acts performed while insane, held that a person may be found legally insane because of long-term voluntary intoxication when

---

[3]Neither party argued that defendant's insanity was caused by a personality, adjustment or seizure disorder.

[4]This determination obviates the necessity of considering defendant's contention that the instruction should have been rejected because the statute was ex post facto as to him.

the intoxication causes a mental disorder which remains after the effects of the intoxicant have worn off. While this mental disorder need not be permanent, it must be of a settled nature and must qualify under the M'Naughton test. One 'does not lose the defense of insanity because [he or she] may also have been intoxicated at the time of the offense.' " (20 Cal.App.4th at p. 1841, fn. omitted.) Earlier, *People* v. *McCarthy* (1980) 110 Cal.App.3d 296 [167 Cal.Rptr. 772] had explained *Kelly*'s (*People* v. *Kelly* (1973) 10 Cal.3d 565 [111 Cal.Rptr. 171, 516 P.2d 875]) holding more colorfully, "If an alcoholic wants to use his problem as an escape hatch, he must drink enough to develop a mental disorder that continues when he is stone sober even though the damage is not permanent in the sense it is beyond repair." (110 Cal.App.3d at p. 299.)

With the passage of section 25.5, the Legislature changed the rule set forth above. Section 25.5 provides that if an accused's insanity is caused *solely* by abuse of or addiction to intoxicating substances, then the insanity defense is not available to him or her. This statute makes no exception for brain damage or mental disorders caused solely by one's voluntary substance abuse but which persists after the immediate effects of the intoxicant have dissipated. Rather, it erects an absolute bar prohibiting use of one's voluntary ingestion of intoxicants as the sole basis for an insanity defense, regardless whether the substances caused organic damage or a settled mental defect or disorder which persists after the immediate effects of the intoxicant have worn off. In other words, if an alcoholic or drug addict attempts to use his problem as an escape hatch, he will find that section 25.5 has shut and bolted the opening.

Although there was, until now, no case law interpreting section 25.5, the legislative history of this section supports this straightforward reading of the statute. This section was enacted in the wake of the three strikes law. The expressed purpose of the statute is to narrow the availability of the insanity defense. According to the sponsor, the number of individuals attempting to plead not guilty by reason of insanity is expected to increase in response to the three strikes law; individuals facing life imprisonment are likely to seek any path available to avoid life imprisonment. The statute's exclusionary provisions "will prevent potential abuse of the plea and therefore, appropriately direct these individuals to the correctional system rather than state hospitals. This will allow state resources to be utilized for the purpose of serving those individuals who would benefit most." (Sen. Com. on Judiciary, analysis of Sen. Bill No. 40X (1993-1994 Reg. Sess.) as amended Apr. 18, 1994.) The reason to exclude substance abuse was explained as follows: "Clinicians agree, that substance abuse, personality, and adjustment disorders are considered as a mental illness but, are not seen as a major mental

disorder. There is a significant difference between an individual with a major mental disorder and a substance abuser. The individual with a major mental disorder does not choose the illness. However, difficult as it may be, a drug or alcohol abuser does have a choice. Typically, these individuals have the capacity to distinguish between right and wrong and should be held responsible for their crimes." (Assem. Public Safety Com., Republican analysis of Sen. Bill No. 40X (1994) p. 17; see also Sen. Com. on Judiciary, Analysis of Sen. Bill No. 40X, *supra*, p. 21.) The legislation takes the position "that substance abuse and addiction is self-induced and does not, by itself, excuse criminal behavior." (Assem. Public Safety Com., Republican analysis, *supra*, p. 27.) By enacting this statute, the Legislature expressed its intent that individuals rendered insane solely because of their substance abuse should be treated differently than those afflicted by mental illness through no conscious volitional choice on their part.

Having determined that section 25.5 did, in fact, change operative law with regard to insanity caused by voluntary ingestion of intoxicants, we next address the question whether the instruction was properly given. ▮ Request for instruction on a legal point should be refused if there is no evidence to which the instruction may be properly related. (*People* v. *Terry* (1970) 2 Cal.3d 362, 402 [85 Cal.Rptr. 409, 466 P.2d 961], overruled on another ground in *People* v. *Carpenter* (1997) 15 Cal.4th 312, 381 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People* v. *Nunez* (1970) 7 Cal.App.3d 655, 662 [86 Cal.Rptr. 707].) "It has long been the law that it is error to charge the jury on abstract principles of law not pertinent to the issues in the case. [Citation.] The reason for the rule is obvious. Such an instruction tends to confuse and mislead the jury by injecting into the case matters which the undisputed evidence shows are not involved." (*People* v. *Jackson* (1954) 42 Cal.2d 540, 546-547 [268 P.2d 6].) ▮ Defendant did not present any evidence showing that his alleged insanity arose solely from his ingestion of intoxicants and he did not rely on this defense below. As shown, *ante*, both Drs. Haddock and Middleton based their opinion of insanity on numerous factors. Neither expert relied exclusively on defendant's drug addiction. During closing argument, defense counsel did not argue that defendant's addiction was the exclusive causative agent of his insanity. He also referenced defendant's mental retardation as a factor to be considered. The trial court even noted that defendant had not relied exclusively on defendant's addiction as the cause of his insanity; defense counsel did not disagree. Likewise, the People did not argue that defendant should not be found insane because his insanity was caused by use of intoxicants. Rather, the prosecutor urged the jury to accept Dr. Estner's opinion that defendant was malingering. Hence, section 25.5 is inapplicable to the instant case and instruction thereon should have been refused for this reason.

We now turn to an assessment of prejudice. It is settled that this type of instructional error does not require reversal unless it is affirmatively shown that defendant was prejudiced thereby and that there is a reasonable probability that, absent the error, the jury would have returned a verdict more favorable to the defendant. (*People* v. *Nunez, supra,* 7 Cal.App.3d at p. 662; *People* v. *Russell* (1943) 59 Cal.App.2d 660, 664 [139 P.2d 661]; *People* v. *Soules* (1940) 41 Cal.App.2d 298, 313 [106 P.2d 639].) First, we can declare without hesitation that defendant was not prejudiced by the trial court's erroneous decision to accede to the People's request for instruction on section 25.5. The instruction was not inflammatory on its face. Since defendant presented no evidence showing that his insanity was solely caused by intoxicants and did not argue this theory to the jury, a reasonable jury would simply have dismissed the special instruction as inapplicable.[5] Second, the evidence of defendant's alleged insanity was weak. Dr. Estner's testimony that defendant was feigning mental illness in order to avoid punishment for his crimes was powerful. He pointed out that defendant took rational steps to avoid detection after the crimes and gave an exculpatory statement shortly after his arrest. The timing of the supposed illness and the lack of any prior documented psychiatric problems further support Dr. Estner's opinion that defendant was malingering. In contrast, Drs. Haddock and Middleton were less convincing. They did not find clear evidence of a specific mental disease or disorder; discussion of a "syndrome" and some unspecified "psychosis" is not particularly persuasive. They were vague on crucial details and overlooked the facts cited by Dr. Estner in support of his malingering diagnosis. Dr. Haddock even acknowledged on cross-examination that defendant exhibited many of the diagnostic indicators of malingering. And Dr. Middleton testified he was not aware defendant had been interviewed near the time of his arrest and had given an exculpatory statement. The weakness of defendant's case is even more significant when it is remembered that it is he who bore the burden of proof. Given this record, we conclude that it is not reasonably probable the jury would have returned a more favorable verdict had the instruction been refused. (*People* v. *Nunez, supra*, 7 Cal.App.3d at p. 662.)

---

[5]For this reason, we also find that it is not probable that the jury would have been confused by the inherent tension between CALJIC No. 4.02 as given and the special instruction. CALJIC No. 4.02 was given as follows: " 'A person is legally insane if by reason of mental disease or mental defect, either temporary or permanent, caused by the long continued use of alcohol and/or drugs, even after the effect of recent use of alcohol and/or drugs have worn off, he was incapable at the time of the commission of the crime of either, one, knowing the nature and quality of his act or, two, understanding the nature and quality of his act or, three distinguishing right from wrong.' "

CALJIC No. 4.02 should be modified to expressly state that it references situations in which the continued use of intoxicants is not the sole basis or causative factor for the alleged mental disease or defect.

II., III.*

* * * * * * * * * * * * * * * * * * * * * * * * * *

## DISPOSITION

The judgment is affirmed.

Ardaiz, P. J., and Vartabedian, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 25, 1999. Kennard, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 421.