Filed 7/24/25  P. v. Ocular CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EMMANUEL OCULAR,<br><br>    Defendant and Appellant. | D082872<br><br><br>(Super. Ct. No. SCD282186) |

APPEAL from a judgment of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Joseph Doyle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Sahar Karimi, Deputy Attorneys General, for Plaintiff and Respondent.

Emmanuel Ocular shot a woman twice in the back as she was standing next to her mother in the parking lot of their apartment complex.  He fled the scene; disposed of the gun; and later told a court appointed psychiatrist that

he was a heavy methamphetamine user, that he had been hearing voices at various times throughout his life, and that he shot the woman because he believed that she was a "demon person possessed by the devil" that could "shape shift" into other people. A jury convicted Ocular of attempted murder, assault with a firearm, and being a felon in possession of a firearm. In a subsequent, bifurcated proceeding, the jury found that Ocular was sane at the time he committed the foregoing offenses. He now asserts the trial court incorrectly instructed the jury, based on CALCRIM No. 3450, regarding the impact of his voluntary use of intoxicants in determining whether he was legally insane when he committed the crimes, thereby violating his rights to due process and a fair trial. We disagree and affirm the judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Because Ocular's arguments are limited to the accuracy of the instructions to the jury on insanity, we provide only a brief overview of the offense, and focus our factual discussion on the portions of the record related to Ocular's claim that he was legally insane.

### A.    The Shooting

On June 13, 2019, at approximately 9:30 p.m., Ocular approached the victim, Daniela Millan, from behind and shot her twice in the back as she was helping her mother remove luggage from her car. Millan had no interaction with Ocular before the shooting, however, Millan's cousin had seen Ocular "pacing" in the apartment complex parking lot prior to the shooting. Ocular had family that lived in an apartment complex across the street and the victim's family recognized him. Immediately after the shooting, Ocular walked to his car and drove away.

The police apprehended Ocular at an office building later that night. One of the officers who first contacted him was wearing a body-worn camera

2

and the prosecution played the video for the jury. Ocular alerted the police to the approximate location of the gun he used to shoot Millan, and the police found the gun in some bushes about half a mile away from where Ocular was apprehended.

The People charged Ocular with one count of attempted murder in violation of Penal Code[1] section 187, subdivision (a); one count of assault with a semi-automatic firearm in violation of section 245, subdivision (b); and one count of being a felon in possession of a firearm in violation of section 29800, subdivision (a)(1). The People further alleged various firearm enhancements as to the first two charges, and asserted Ocular had a serious felony prior and a strike prior. Ocular pled not guilty and not guilty by reason of insanity. The court bifurcated the trial into a guilt phase and an insanity phase.

## B. Guilt Phase Mental State Evidence

During the guilt phase, Ocular did not dispute that he shot Millan. Rather, his primary defense was that he did not have the requisite specific intent to kill a human, due to either voluntary intoxication or a mental disease or disorder.[2]

### 1. Defense Expert Dr. Alan Abrams

Ocular called Dr. Alan Abrams to testify in his defense. The court assigned Dr. Abrams to conduct a psychological exam of Ocular to determine

---

[1] Further unspecified statutory references are to the Penal Code.

[2] During the guilt phase, the trial court instructed the jury with CALCRIM Nos. 3426 and 3428, which stated, respectively, that the jury could consider evidence of voluntary intoxication or a mental disease or disorder only in deciding whether Ocular acted with the specific intent to kill a person. Defense counsel argued, for the guilt phase, that it did not matter whether Ocular was impaired because of long-term drug use.

3

whether he was sane in 2019. Because of the Covid-19 outbreak, Dr. Abrams was not able to conduct the interview until April of 2021, approximately 33 months after the shooting. By that time, Ocular had been on an antipsychotic medication for about a year and a half.

Ocular told Dr. Abrams that he used methamphetamine and "many other drugs." He said he heard voices at various times in his life but, starting in 2018, he heard "troubling voices from angels and demons and supernatural beings." One of the voices told him that he needed to jump off the Imperial Beach pier to save his family, which he did.

Ocular continued to use methamphetamine and other drugs after the pier incident, and began carrying a gun because he believed the Illuminati were after him. He was staying with his uncle around the time of the shooting, but his uncle kicked him out because he was frightened by Ocular talking about angels and demons. Ocular saw Millan in the parking lot and believed she was part of the cosmic world and could shape shift into other people. Ocular told Dr. Abrams that the shape shifter "reached out" to him, and he shot her.

Dr. Abrams opined that Ocular was psychotic and, more specifically, schizophrenic. He acknowledged that many factors, including substance abuse, can play a role in psychosis, but asserted "that after a period of acute intoxication and acute withdrawal has been met, and the person remains with the symptoms 30 days after last use, the diagnosis is schizophrenia continuous." Dr. Abrams rejected the notion that using methamphetamine was a form of "self-medication," but noted that drug use is common in schizophrenic individuals because schizophrenia destroys the brain's ability to feel happiness. He explained that drugs may offer a feeling of euphoria

4

that those suffering from schizophrenia cannot otherwise obtain, but that ultimately, they make the condition worse.

Dr. Abrams reviewed the body-worn camera footage from the night of the shooting, along with Ocular's uncle's statement and other contemporaneous materials, and concluded that Ocular was not acting rationally when he shot Millan. In his view, Ocular was "in the world of make believe" and his actions were based on that. Dr. Abrams also reviewed hospital records and noted that Ocular had been placed on a psychiatric hold in 2018, which suggested to him that Ocular was mentally ill prior to the shooting.

On cross-examination, Dr. Abrams conceded that Ocular also said that the voices told him to kill himself—"that he was gutless and he should cut his stomach open"—but that he did not do that. Dr. Abrams also said that Ocular told him the victim "switch[ed] into another person that he called Norma." Ocular believed the person to be an actual human being when he shot her, although he clarified that Ocular believed the victim was possessed by a devil.

Dr. Abrams also reviewed a video and transcript of a police interrogation of Ocular after the shooting. He conceded that Ocular initially denied that anything happened. Ocular eventually admitted that he did shoot someone, and that he tossed the gun, but did not speak of angels or demons or say that was the reason he shot Millan. Dr. Abrams asserted this was because the officer interrogating Ocular did not give him an opportunity to explain. Dr. Abrams agreed, however, that some of Ocular's actions (i.e., fleeing the scene and disposing of the gun) appeared to show "goal-directed behaviors."

### 2. Prison Psychologist Shanda Angioli

The People called Shanda Angioli as a rebuttal witness. Angioli worked as a clinical psychologist for the Department of Corrections and Rehabilitation. She evaluated Ocular when he was first booked into jail on June 14, 2019. She said that Ocular did not appear to be responding to any internal stimuli and he denied experiencing auditory hallucinations. He did not have difficulty answering questions and his thought process was linear. He did tell Angioli about his previous suicide attempt, when he jumped off the pier. He was placed in Enhanced Observation Housing as a result, but his risk level was "low."

Ocular said that he used alcohol every day and used methamphetamine often. Angioli diagnosed Ocular with alcohol-use disorder and methamphetamine-use disorder.

### 3. Detective Christopher Tews

Christopher Tews was the detective assigned to investigate the shooting. He interviewed Ocular on the night of the shooting, at approximately midnight. Ocular was able to provide background information about himself and had no trouble answering the questions asked. Detective Tews did not observe any behaviors that would lead him to believe Ocular needed to be medically evaluated. Ocular did speak of a person shape shifting into another person, but Detective Tews testified on cross examination that he did not consider that a nonsensical response.

The jury found Ocular guilty of all charges and found true the associated firearm allegations.

### C. Sanity Phase

The trial court then turned to the sanity phase of the trial. Before allowing additional evidence, the trial court instructed the jury with a modified version of CALCRIM No. 3450, informing them what they should

6

consider in evaluating whether Ocular was sane when he committed the crimes. The trial court also informed the jury that they could rely on evidence from the guilt phase in assessing whether Ocular was sane. The trial court reiterated the CALCRIM No. 3450 instruction partway through the testimony, at the request of both attorneys, and again before the jury began deliberating.

### 1. Defense Expert Dr. Abrams

Dr. Abrams testified again during the sanity phase. He explained that even people who are severely mentally ill can appear to function normally at certain times. For example, they may do routine tasks like driving without any problems. They may also carry on a lengthy conversation without any indication of their distorted perceptions, particularly if the topics discussed do not touch on their delusions. In addition, some mentally ill people may avoid talking to others, particularly psychiatrists, about their mental illness or delusions, because they do not want to be treated. Prison gangs also frequently tell their members not to talk about mental illness.

Dr. Abrams distinguished between "substance-induced" short-term psychosis, and longer-term persistent psychosis. He explained that neurotoxins, like alcohol and methamphetamine, can cause permanent brain damage that leads to "settled insanity." The latter is typically diagnosed after an individual has been sober for 30 days but continues to experience psychosis. Because Ocular had not been using substances for more than 30 days in jail, Dr. Abrams was able to make a diagnosis of schizophrenia. Dr. Abrams acknowledged that drugs are available in most jails but opined that Ocular did not appear to be intoxicated during his interview, and therefore assumed that he had been sober for more than 30 days.

Dr. Abrams opined that neurotoxic drugs "played a significant role" in Ocular's illness, "but not the only role." He explained that the scientific

7

community agreed "we [cannot] tell whether there are genetic factors, individual factors, life experience factors, nanotoxicities that cause psychosis," but there was agreement that "drugs make psychosis worse." When Ocular had been evaluated in the past, he had been under the influence of neurotoxins, and there had not been a 30-day period after during which the treating physician or psychiatrist could rule out schizophrenia continuous.

He explained further, "There's no blood test yet where we can say, you have these three snips [of] nucleotide substitutions that mean you have the genes for schizophrenia. So that makes it impossible for us to say whether people who become psychotic from smoking marijuana; from using LSD; from using methamphetamine; who become psychotic and stay psychotic beyond 30 days are psychotic because they have the genetic predisposition plus damage to their brain cells, which results in the illness, or because everybody who took those drugs would become psychotic for the rest of their life." However, he pointed out that some people use those same drugs and do not become permanently psychotic.

Dr. Abrams reiterated his conclusion that Ocular had "a serious mental disease," which he diagnosed as schizophrenia continuous. Based on his review of the contemporaneous records, he believed Ocular demonstrated that same psychosis when he committed the underlying crime. Dr. Abrams explained that, at the time of the shooting, Ocular believed he was shooting a dangerous demon or possessed being. In that sense, Ocular believed he was doing the right thing, even if he also understood that killing a human was wrong.

Dr. Abrams again agreed that Ocular demonstrated some goal-oriented behavior after the shooting but explained that a person may commit a

seemingly normal act for a delusional reason. During his interview, Ocular told Dr. Abrams, "I saw the shadow go into street. I drove away chasing the shadow which disappeared. I followed the shadow as far as I could. The voices said they were going to get my nephew. I saw the cops, and the angel told me to take off. I was in a panic. I fired at a demon in the car next to me. I ran out of gas." In Dr. Abrams' opinion, that was delusional thinking dictated by mental illness.

On cross-examination, Dr. Abrams agreed that methamphetamine can cause delusions; that he was the first to diagnose Ocular with schizophrenia; that Ocular had previously been diagnosed with substance-induced psychotic disorder; and that while they are different diagnoses, the symptoms can mimic one another. He said that Ocular told him he experienced auditory delusions while using methamphetamine, but it was not clear to him whether Ocular's symptoms started only after he used methamphetamine. Dr. Abrams noted that Ocular began using drugs at the age of 14, and did not have a mental health diagnosis at that time.

Dr. Abrams testified that the DSM says that drug use by itself is unlikely to cause persisting psychosis. When pressed, Dr. Abrams explained, "The position of the [American Psychiatric Association] that I've been trying to testify to is that no one can say that use of drugs causes the mental illness. Or the view of the APA is, therefore, that people who develop persistent mental illness and have a history of neurotoxic drug abuse, that the drugs have accelerated the onset of the illness."

### 2. Prosecution Fact Witnesses

The prosecution presented several fact witnesses in response to Ocular's asserted insanity defense, primarily centered on Ocular's prior mental health evaluations.

9

Katherine Rodriguez, a clinical psychologist, evaluated Ocular in prison in 2012. Ocular was referred for mental health services because of depression and trouble sleeping. He did not meet the criteria for mental health housing but wanted therapy for his drug addiction.

Yoshinori Sato, a clinical psychologist, evaluated Ocular in prison in September 2015. Ocular requested a mental health referral for anxiety, anger, and irritability. He was alert and oriented and did not report any prior mental health history.

Elizabeth Harris, a clinician, evaluated Ocular in prison in 2016. She noted that Ocular had been on medication for anxiety and had participated in a mental health program twice, in 2002 and 2015, for anxiety and sleep issues. He did not disclose any other mental health treatment or history.

Takeshia Niday, a board-certified psychiatrist, evaluated Ocular at the hospital in 2018 after he jumped off the pier. Ocular was placed on a 72-hour psychiatric hold based on the suicide attempt. Ocular reported that he had been using methamphetamine and that he jumped because he thought his life was in danger. A toxicology test came back positive for alcohol, opiates, and cocaine.

When Niday spoke with Ocular, his thought process was linear and goal oriented. She diagnosed Ocular with "psychotic disorder not otherwise specified with several rule outs including substance-induced psychosis, chronic paranoid schizophrenia, and schizoaffective disorder." She explained that a "rule out" is something a psychiatrist would take into consideration and try to rule in or out with further evaluation and treatment. Niday thought it was likely that Ocular's psychosis was drug induced and noted that it did resolve while he was hospitalized.

Kyle Thorstenson supervised Ocular on parole from 2018 to 2019. Ocular had to submit to regular drug testing. Ocular consistently tested negative and maintained employment during that time.

Rodney Thomas, a police officer, contacted Ocular during a traffic stop in May 2019. Ocular followed instructions and Thomas recalled that there was nothing remarkable about the stop.

Charmaine Solmerano, a registered nurse, evaluated Ocular in San Diego County jail in 2019. Ocular was calm, cooperative, and verbalized no complaints.

Ryanne Colbert, a licensed psychologist, evaluated Ocular on July 3, 2019. Ocular reported having anxiety and post-traumatic stress disorder. He denied seeing hallucinations at that time but reported that he had hallucinated in the past and believed his hallucinations were initiated by his substance use.

### 3.   Prosecution Expert Stacey Berardino

Stacey Berardino, a clinical and forensic psychologist, testified as an expert for the prosecution. Berardino was appointed by the court to provide a sanity evaluation. She reviewed the relevant discovery and interviewed Ocular in prison in April 2021.

Berardino assessed Ocular with the Miller Forensic Assessment of Symptoms Test (M-FAST). Ocular's score was "really elevated," which indicated that he could be exaggerating his symptoms.

Ocular said that he started drinking alcohol at 5 years old and was drinking regularly by 14. He said the last time he drank was one week prior, and that he had been drinking weekly while incarcerated. He also said that he used methamphetamine in prison, although it was not clear when this was.

Berardino opined that Ocular suffered from multiple substance abuse disorders, including amphetamine, alcohol, marijuana, and cocaine. She also made a rule-out diagnosis for mood disorder and psychotic disorder. Those were rule-out because she did not have the opportunity to evaluate Ocular while he was not abusing substances. She could not diagnose schizophrenia for the same reason; substance abuse had always been and still was present.

Ocular did speak of demons during the evaluation, and Berardino said there was no doubt that there were symptoms of psychosis when Ocular shot Millan. However, she believed that Ocular could understand the nature and quality of his act. He knew that he was in trouble when he saw the police officers, and he knew that he was not allowed to possess a gun.

After hearing the evidence and argument the jury found that Ocular was sane at the time he committed the crimes.

### D.    Sentencing

Ocular waived his right to a jury trial as to the allegations regarding his prior conviction and the aggravating factors for sentencing. The trial court found that he had a prior conviction that was both a serious felony and a strike. The court declined to find that the victim was vulnerable but found that the prosecution had proven four other aggravating factors beyond a reasonable doubt: that Ocular had been convicted of numerous other crimes; that he had served a state prison prior; that he was on parole at the time of the shooting; and, that his prior performance on parole was unsatisfactory.

The trial court sentenced Ocular to 25 years to life, plus a determinate term of 15 years 4 months.

Ocular filed a timely notice of appeal.

## II.    DISCUSSION

Ocular's sole assertion on appeal is that the trial court incorrectly instructed the jury on the role of intoxicants in determining whether he was sane when he committed the crimes.

### A.    Relevant Legal Principles

Section 25 sets forth the parameters of an insanity defense and provides, in relevant part, "this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense."  (§ 25, subd. (b).)  "Our Supreme Court has interpreted this statutory language to mean that insanity can be shown under either the 'nature and quality' prong or the 'right from wrong' prong of the test."  (*People v. McCarrick* (2016) 6 Cal.App.5th 227, 246 (*McCarrick*).)

"If a defendant pleads both not guilty and not guilty by reason of insanity, the trial is bifurcated."  (*McCarrick, supra,* 6 Cal.App.5th at p. 246.)  If the jury finds the defendant guilty during the guilt phase, the trial then proceeds to the sanity phase, where the defendant must prove either that he or she was "incapable of knowing or understanding the nature and quality of his or her act" or that he or she was incapable of "distinguishing right from wrong" at the time he or she committed the crime.  (*Ibid*.)  "Although mental illness (or defect) may cause insanity, the concepts are different.  Mental illness is a medical diagnosis; it alone does not necessarily establish legal insanity."  (*People v. Kelly* (1992) 1 Cal.4th 495, 540.)  Rather, the defendant must establish the illness made him or her legally insane under the foregoing statutory test.  (*Ibid*.)

13

Section 29.8 puts certain limitations on the insanity defense, and precludes application "solely on the basis of a personality or adjustment disorder, a seizure disorder, or an addiction to, or abuse of, intoxicating substances."  The statute, originally passed as section 25.5 in 1994, changed the previous rule, which allowed a jury to find a person insane based on long-term voluntary intoxication.  (See *People v. Robinson* (1999) 72 Cal.App.4th 421, 427 (*Robinson*); Senate Bill No. 40 (Stats. 1993-1994, 1st Ex. Sess., ch. 10, §1) [original statute]; Senate Bill No. 1171 (Stats. 2012, ch. 162, § 120) [renumbering].)

"The expressed purpose of the statute [was] to narrow the availability of the insanity defense."  (*Robinson*, *supra*, 72 Cal.App.4th at p. 427.)  "By enacting this statute, the Legislature expressed its intent that individuals rendered insane solely because of their substance abuse should be treated differently than those afflicted by mental illness through no conscious volitional choice on their part."  (*Id*. at p. 428.)

Accordingly, section 29.8 "makes no exception for brain damage or mental disorders caused solely by one's voluntary substance abuse but which persists after the immediate effects of the intoxicant have dissipated.  Rather, it erects an absolute bar prohibiting use of one's voluntary ingestion of intoxicants as the sole basis for an insanity defense, regardless whether the substances caused organic damage or a settled mental defect or disorder which persists after the immediate effects of the intoxicant have worn off."  (*Robinson*, *supra*, 72 Cal.App.4th at p. 427.)

However, "[w]here the mental disease or defect is caused *in part* by an addiction or abuse of alcohol," the defendant may still be entitled to an insanity defense and whether the defense applies becomes a question of *fact*

14

for the jurors to resolve. (*People v. Cabonce* (2009) 169 Cal.App.4th 1421, 1436 (*Cabonce*).)

## B. CALCRIM No. 3450

CALCRIM No. 3450 sets out the model jury instruction for legal insanity. It provides two bracketed instructions addressing the impact of substance abuse on the asserted defense:

> "[Special rules apply to an insanity defense involving drugs or alcohol. Addiction to or abuse of drugs or intoxicants, by itself, does not qualify as legal insanity. This is true even if the intoxicants cause organic brain damage or a settled mental disease or defect that lasts after the immediate effects of the intoxicants have worn off. Likewise, a temporary mental condition caused by the recent use of drugs or intoxicants is not legal insanity.]

> "[If the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, that settled mental disease or defect combined with another mental disease or defect may qualify as legal insanity. A *settled mental disease or defect* is one that remains after the effect of the drugs or intoxicants has worn off.]"

The associated Bench Notes to CALCRIM No. 3450 state:

> "Give the bracketed paragraph that begins with 'Special rules apply' when the sole basis of insanity is the defendant's use of intoxicants. [(§ 29.8; *Robinson, supra,* 72 Cal.App.4th at pp. 427–428).] If the defendant's use of intoxicants is not the sole basis or causative factor of insanity, but rather one factor among others, give the bracketed paragraph that begins with 'If the defendant suffered from a settled mental. (*Id*. at p. 420, fn 5).' "

## C. Instruction As Given in Ocular's Case

In the present case, the trial court noted the bracketed portions of CALCRIM No. 3450 and stated that it read the bench notes to suggest that the two portions were offered as alternatives. The court invited counsel to

consider the bracketed portions and indicated that it was inclined to give both.  The prosecutor agreed, but Ocular's counsel asserted the trial court should give only the second portion.  The trial court ultimately decided to give both portions, over defense counsel's objection.

Accordingly, the trial court instructed the jury, in relevant part as follows:

> "You have found the defendant guilty of attempted murder, assault with a deadly weapon, and unlawful possession of a firearm. Now you must decide whether he was legally insane when he committed the crimes.
>
> "The defendant must prove that it is more likely than not that he was legally insane when he committed the crimes.
>
> "The defendant was legally insane if:
>
>> "1. When he committed the crimes, he had a mental disease or defect;
>>
>> "AND
>>
>> "2. Because of that disease or defect:
>>
>>> "• he was incapable of knowing or understanding the nature and quality of his act,
>>>
>>> "• or he was incapable of knowing or understanding that his act was morally wrong,
>>>
>>> "• or he was incapable of knowing or understanding that his act was legally wrong.
>
> "Do not base a finding of not guilty by reason of insanity solely on the basis of a personality disorder, adjustment disorder, seizure disorder, or an abnormality of personality or character made apparent only by a series of criminal or antisocial acts.

16

"Special rules apply to an insanity defense involving drugs or alcohol. Addiction to or abuse of drugs or intoxicants, by itself, does not qualify as legal insanity. This is true even if the intoxicants cause organic brain damage or a settled mental disease or defect that lasts after the immediate effects of the intoxicants have worn off, if that brain damage or settled mental disease or defect was caused solely by the defendant's voluntary substance use. Likewise, a temporary mental condition caused by the recent use of drugs or intoxicants is not legal insanity.

"If the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, that settled mental disease or defect combined with another mental disease or defect may qualify as legal insanity. A *settled mental disease or defect* is one that remains after the effect of the drugs or intoxicants has worn off."

### D. Analysis

Ocular asserts the foregoing instruction was erroneous for two reasons. First, the instruction improperly precluded a finding of insanity if the insanity was even partially caused by drug use. Second, the instruction improperly precluded a finding of insanity based on a singular mental disease or defect caused partially by drug use.

We reject each of these contentions. As an initial matter, we note that Ocular likely forfeited each of these challenges by failing to raise them in the trial court. (See *McCarrick, supra,* 6 Cal.App.5th at p. 250 [defendant may not argue instruction was too general or incomplete absent a request in the trial court for clarifying or amplifying language].) When the parties first discussed CALCRIM No. 3450, defense counsel objected to the trial court giving both portions of the bracketed instructions dealing with substance use, but did not suggest any changes or additions to the language. During a subsequent discussion, defense counsel asked the court to read section 29.8,

17

instead of repeating the instruction, and stated, in reference to the instruction, "I think it is confusing for the jury." As Ocular concedes, these arguments were not "as specific" as the claim he now raises on appeal.

However, because Ocular asserts that his arguments remain cognizant on appeal by virtue of impacting his substantial rights and that his trial counsel was ineffective for failing to object, we exercise our discretion to reach the merits of his assertions. We are not persuaded by either.

### 1.    Standard of Review

"We review instructional error claims under a de novo standard of review." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 175.) "The proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) To do this, we assess the full set of instructions, viewing the challenged instruction in context with the others to determine whether there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*People v. Jennings* (2010) 50 Cal.4th 616, 677.) "We presume that jurors understand and follow the court's instructions." (*People v. Pearson* (2013) 56 Cal.4th 393, 414.)

### 2.    The Instruction Did Not Improperly Preclude a Finding of Insanity Based on a Mental Defect or Disease Caused Partially by Intoxication

Ocular first asserts that the instruction was improper, or incomplete, because it did not adequately instruct the jury that it could find him legally insane even if his intoxication was a partial cause of the mental defect or disease giving rise to his insanity defense.

He points first to the last statement of the first bracketed paragraph which instructed the jury, consistent with CALCRIM No. 3450 that "a temporary mental condition caused by the recent use of drugs or intoxicants

18

is not legal insanity." He asserts this sentence did not properly inform the jury that it is not legal insanity only if the temporary mental condition is *solely* cause by drugs or intoxicants. We disagree.

Ocular focuses in on the last sentence of the first bracketed paragraph and, in doing so, he fails to read the instruction as a whole, as required by the law. After stating that special rules apply to an insanity defense involving drugs or alcohol, the first bracketed paragraph informed the jury that the "abuse of drugs or intoxicants, *by itself*, does not qualify as legal insanity." (Italics added.) The instruction then went on to explain that this is true even if the substance abuse causes organic brain damage or a settled mental disease or defect, "if that brain damage or settled mental disease or defect was caused *solely* by the defendant's voluntary substance use." (Italics added.) Notably, the trial court added the foregoing additional language to the model CALCRIM instruction in this case, reminding the jurors that organic brain damage or a settled disease or defect precluded an insanity defense *only if* it was caused *solely* by voluntary substance use. The instruction then concluded by telling the jury: "*Likewise*, a temporary mental condition caused by the recent use of drugs or intoxicants is not legal insanity." (Italics added.)

Throughout the instruction, the jury was told, and reminded, consistent with section 29.8, that Ocular could not prove insanity based *solely* on an addiction to, or abuse of, intoxicating substances. Although the last sentence is specific to a *temporary* mental condition, as opposed to a settled mental disease or defect, the "likewise" at the start of the final sentence of the first paragraph clearly indicates that sentence is to be read consistent with the preceding statements, all of which specify, repeatedly, that the alleged

19

damage or disease must be caused *solely* by substance abuse to be excluded as the basis of an insanity defense.

Here, Ocular asserts, based on Dr. Abrams's testimony that he was suffering from a "long-standing mental disease or defect—schizophrenia— and he was also a regular user of methamphetamine." He argues that substance abuse is not uncommon for individuals suffering from schizophrenia, and that the jury was entitled to consider whether it was the underlying schizophrenia, and not the use of intoxicants, that caused his insanity. We see nothing in the instruction that would preclude the jury from making such a determination.

If the members of the jury credited Dr. Abrams's testimony and believed that Ocular was schizophrenic, separate and apart from his drug use, it follows that they would not have concluded that Ocular had a *temporary* mental condition (i.e., temporary psychosis caused by intoxicants). Rather, they would have concluded he had a settled mental disease or defect, and then, according to the instruction, they would have had to consider whether that settled mental disease or defect was caused *solely* by Ocular's extended use of intoxicants.[3] Such a determination would be consistent with section 29.8, which precludes an insanity defense based *solely* on "an addiction to, or abuse of, intoxicating substances." (§ 29, subd. (b).)

---

[3]     Likewise, if the jury concluded that Ocular's substance abuse caused temporary psychosis, they still could have concluded that he *also* had a separate settled disease, schizophrenia, that could qualify as the basis for an insanity defense under the second bracketed paragraph of CALCRIM No. 3054, which discuss in more detail *post*.

Ocular likewise asserts the second bracketed paragraph of CALCRIM No. 3450 precluded a finding of insanity based on a single mental disease or defect that is caused, in part, by intoxication.

Again, Ocular relies on a single sentence in the instruction: "If the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, that settled mental disease or defect combined with another mental disease or defect may qualify as legal insanity." He asserts this sentence informed the jury that if a settled disease or defect is caused even partly by drug use, it must be combined with an entirely separate disease or defect to establish an insanity defense. We disagree. Like the first issue Ocular raises, the sentence must be read in conjunction with the remaining portions of the instruction. Doing so, we discern no error.

The second paragraph provides an alternative option to the defendant for *proving* an insanity defense. After first informing the jury about the limitations of section 29.8 in the first bracketed paragraph, namely that an insanity defense cannot be based *solely* on the use of intoxicants, the second bracketed paragraph of CALCRIM No. 3450 informed the jury that the defendant *could* still prove insanity by demonstrating that he or she suffered from another mental disease or defect that was *not* caused *solely* by the use of intoxicants. Thus, if the jury credited Dr. Abrams' testimony that Ocular suffered from schizophrenia, it could have considered *that* diagnosis separate from any psychosis induced by his substance abuse.

Ocular asserts the second paragraph of the instruction should have repeated the word *solely*, stating instead, "If the defendant suffered from a settled mental disease or defect caused *solely* by the long-term use of drugs or intoxicants . . . ." Again, though, Ocular did not request such a modification

21

and, regardless, when read in conjunction with the preceding paragraph, it is apparent that the use of intoxicants is preclusive only if it is the *sole* cause of the resulting brain damage or mental disease or defect.

Here, after extensive testimony from two competing experts, the prosecutor asserted that Ocular's psychosis was induced by his drug use, and argued, "the fact that Mr. Ocular used a lot of drugs from a very young age and caused permanent organic brain damage does not mean he gets to avail himself to this legal defense." Neither that argument nor the instruction indicated to the jury that it could not consider Dr. Abram's testimony that Ocular suffered from schizophrenia. However, the jury was also permitted to consider whether and to what extent the schizophrenia was caused by Ocular's long-term use of intoxicants, and whether and to what extent the schizophrenia or the use of intoxicants, alone, impacted Ocular's ability to understand the nature of his acts.

The instructions the trial court gave, when read in their entirety, properly permitted the jury to conclude either that Ocular did understand the nature of his act or that it was morally and legal wrong, *or* that any disease or defect that impaired his ability to understand those things was caused solely by his extended use of intoxicants. The latter is consistent with section 29.8. To the extent the jury declined to credit Dr. Abrams' assertion that Ocular had schizophrenia separate and apart from his drug use in reaching that conclusion, and concluded instead that any psychosis was the result of Ocular's extended drug use, they were entitled to do so.

Ocular relies on *Robinson*, to assert that the use of intoxicants does not always preclude a finding of insanity, and that section 29.8 applies only when substance abuse is the *sole* cause of the condition. (See *Robinson, supra,* 72 Cal.App.4th at p. 427; see also *People v. Kelly* (1973) 10 Cal.3d 565, 577, fn.

22

17.) We have no quarrel with this assertion. We simply conclude the instruction, read in its entirety, properly defines the limitation of the defense as set forth in section 29.8.

As the parties seem to agree, *Cabonce* is instructive here. In *Cabonce*, the court instructed the jury with CALJIC No. 4.00, and stated, in relevant part, " 'However, this defense of legal insanity does not apply when the *sole* or *only basis or causative factor* for the mental disease or mental defect is a personality disorder, a seizure disorder, or an addiction to, or *abuse of, intoxicating substances*.' " (*Cabonce, supra,* 169 Cal.App.4th at p. 1434.)

The *Cabonce* court further instructed the jury with CALJIC No. 4.02, stating, " 'A person is legally insane if by reason of mental disease or mental defect, either temporary or permanent, caused *in part* by the long continued use of alcohol, drugs, [or] narcotics even after the effects of recent use of alcohol, drugs, or narcotics have worn off, he was incapable [of understanding the nature of his act or distinguishing right and wrong] at the time of the commission of the crime. . . . [¶] However, this defense does not apply when the *sole or only basis or causative factor* for the mental disease or mental defect *is an addiction to, or an abuse of, intoxicating substances*.' " (*Cabonce, supra,* 169 Cal.App.4th at p. 1434.)

When the *Cabonce* jury expressed difficulty in understanding these instructions, the trial court provided a portion of CALCRIM No. 3450 and instructed them further, consistent with the instruction given in this case: " 'Special rules apply to an insanity defense involving drugs or alcohol. Addiction to or abuse of drugs or intoxicants, by itself, does not qualify as legal insanity. This is true even if the intoxicants cause organic brain damage or a settled mental disease or defect that lasts after the immediate effects of the intoxicants have worn off. Likewise, a temporary mental

23

condition caused by the recent use of drugs or intoxicants is not legal insanity.' " (*Cabonce, supra,* 169 Cal.App.4th at p. 1435.)

Finally, when the jury continued to express confusion about the term "causative factor" in CALJIC No. 4.02, the court instructed further: " 'The defense of legal insanity *never* can be proved, as a matter of law, when the mental disease or defect is caused *only* by an addiction to, or an abuse of, intoxicating substances. [¶] 2. *In some cases the defense of legal insanity might not be proved, based on the weight of the evidence and the facts as the jury finds them, when the mental disease or mental defect, is caused primarily by an addiction to, or an abuse of, intoxicating substances.*' " (*Cabonce, supra,* 169 Cal.App.4th at p. 1436.)

On appeal, Cabonce argued the second paragraph of the final instruction "impermissibly allowed the jury to reject the insanity defense if it found his intoxication at the time of the [crime] was merely the primary cause of his mental disease or defect." (*Cabonce, supra,* 169 Cal.App.4th at p. 1436.) The court rejected this argument. It explained, "while the first paragraph of the court's response informed jurors that if intoxication was the sole cause of the defendant's mental disease or defect, the insanity defense did not apply *as a matter of law,* the contested second paragraph told jurors that if intoxication was merely a 'primary' cause of the defendant's mental disease or defect, whether the insanity defense applied was a question of *fact* for the jurors to resolve based on the evidence, in light of the instructions." (*Ibid.*)

Likewise, here, although the trial court did not give any additional instruction, the instruction it did give informed the jury that the insanity defense was not available if the alleged mental disease or defect was caused *solely* by Ocular's use of intoxicants. If the jury concluded the alleged mental

24

disease or defect—schizophrenia—was *not* caused *solely* by Ocular's use of intoxicants, it then had to resolve the *fact* question of whether the defense applied, based on the relevant instructions and evidence. We acknowledge that the trial court here did not expressly instruct the jury that the defense *might* still apply, but notably, the trial court also did not give the CALJIC instruction that seems to have caused the confusion in *Cabonce* in the first instance. Regardless, Ocular did not ask for that type of instruction and, for the reasons we have explained, the instructions that were given did not preclude the jury from reaching that same conclusion.

### 3. Any Further Instructional Error Related to Temporary Insanity Was Not Prejudicial

As a final matter, to the extent Ocular asserts the instruction improperly informed the jury that temporary insanity could not be caused by drug use at all to qualify as a defense to the charged offenses, Ocular did not raise a temporary insanity defense.

In discussing the last sentence of the first bracketed paragraph, Ocular asserts that sentence "did not limit or define the extent to which the drug use would have had to have caused the temporary condition to preclude a finding of insanity. Rather, it barred a finding of insanity based on a temporary condition in any way caused by drug use and thus precluded a finding of insanity based on *any* drug use at all."

As we have already discussed, the last sentence of the first bracketed paragraph must be read in conjunction with the entire instruction. Doing so, the last sentence simply clarifies that a temporary mental condition is treated similarly to a settled mental condition in the sense that it, likewise, cannot be caused solely by using intoxicating substances.

Regardless, any error related specifically to the instruction as it relates to a temporary mental condition is not prejudicial because Ocular did not

25

assert that he was suffering from a temporary mental condition (although, notably, he did assert voluntary intoxication as a defense in the guilt phase). Ocular asserts that he was suffering from a "long-standing mental disease or defect—schizophrenia—and he was also a regular user of methamphetamine." While Dr. Abrams, and defense counsel, suggested that Ocular's intermittent use of methamphetamine may have exacerbated or enhanced the schizophrenia, neither characterized the schizophrenia as a temporary condition. To the contrary, the only potentially temporary condition discussed was methamphetamine induced psychosis, which *is*, by definition, based entirely on the use of intoxicants.

The prosecutor argued, consistent with the evidence and the instruction, "A temporary condition caused by the recent use of drugs is not legal insanity. So the fact that Mr. Ocular was injecting methamphetamine, smoking methamphetamine for the two weeks leading up to the crime, slamming it in—his words—and then went out and shot Millan does not qualify as a defense of mental insanity." To the extent Ocular wished to assert that he had some *temporary* mental condition at the time of the charged offenses, a temporary condition that was not caused solely by methamphetamine intoxication, nothing in the instruction or associated argument precluded him from doing so; however, the record before us does not reveal any such defense.

For the foregoing reasons, we conclude the trial court did not err in instructing the jury on the role of intoxicants in determining sanity. For the same reasons, we conclude the instruction, as given, did not violate Ocular's due process right to a fair trial under the Sixth and Fourteenth Amendments.

26

### III. DISPOSITION

The judgment is affirmed.

KELETY, J.

WE CONCUR:

DATO, Acting P. J.

DO, J.